## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSEPH BOSSART, ERNEST HOLGUIN, DAVID GOLDBERG, JAMES KALKSTEIN, ROBERT SMITH, CAROLE SMITH, DENNIS GLAZER, MARIANNE GLAZER, MICHAEL ROTH, RONNIE E. BARKER, RICHARD BARRINGTON, STEVEN M. CHOOKAZIAN, ERIC CZAJKA, ALFRED LUPIS, PHILIP MIRENDA, CHRISTA ROCHFORD, DERROL TURNER and TROY WILLIAMS individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>          Defendant. | Civil Action No. 2:20-cv-11057<br><br>Hon. Bernard A. Friedman<br><br>Magistrate Judge David R. Grand<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1. Plaintiffs Joseph Bossart, Ernest Holguin, David Goldberg, James Kalkstein, Robert Smith, Carole Smith, Dennis Glazer, Marianne Glazer, Michael Roth, Ronnie E. Barker, Richard Barrington, Steven M. Chookazian, Eric Czajka, Alfred Lupis, Philip Mirenda, Christa Rochford, Derrol Turner and Troy Williams ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2015 to 2019 Chevrolet Corvette Z06 or 2017 to 2019 Chevrolet Corvette Grand Sport vehicle ("Class Vehicles") designed,

manufactured, marketed, distributed, sold, warranted, and/or serviced by General Motors LLC ("GM" or "Defendant"). Plaintiffs allege as follows:

## I.   INTRODUCTION

2. This is a consumer class action concerning the sale of high-performance motor vehicles that are defective and pose a safety concern to consumers.

3. General Motors LLC manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' wheels are defective in design or material.

4. The Class Vehicles are equipped with wheels (a.k.a., rims) that are prone to deforming and cracking, without impact damage, and which necessitate costly repairs and replacements. These problems can cause the rims to puncture the tires, causing air leaks and tire blowouts (collectively, the "Wheel Defect.")

5. On information and belief, the Wheel Defect occurs because the Class Vehicles (which are sub-models of the Corvette line) have wheels with inferior material which is cast, rather than forged, and is of insufficient strength, and in an insufficient quantity, to withstand the torque and power input from the drivetrain. On information and belief, GM also used less material than necessary in order to try to save un-sprung weight (i.e., weight that is not borne by the vehicle's suspension). As a result, the rims are not strong enough and crack and deform under normal driving conditions.

6. As a result of the Wheel Defect, wobbling conditions, out of round conditions, and deformation of the rim flange occur which causes vibration perceptible to the driver through the body of the vehicle and through the steering wheel at various speeds. Cracks in the barrel cause a loss of air pressure and an unsafe condition and cause the rim to lose strength and become vulnerable to failure under loading conditions such as braking.

7. The problem is widespread. In fact, during Car & Driver magazine's review of one 2017 Chevrolet Corvette Grand Sport, Car & Driver had to repair seven wheels and replace three wheels on the one vehicle they were reviewing. In this case, the repairs cost Car & Driver $4,098, which GM refused to cover under warranty.[1] Car & Driver noted that these wheel failures were so regular that a failure occurred every 4,000 miles. As set forth below, costs to consumers regularly run much higher, and consumers regularly paid over $900 per wheel to replace one cracked wheel with an equally defective replacement wheel.

8. The Class Vehicles' wheels are prone to warping and cracking at extremely low mileages. For example, Plaintiffs Robert and Carole Smith's vehicle was vibrating and shimmying while they were driving their new vehicle away from the dealership for the first time. Likewise, by around 1,100 miles, three out of the four wheels on Plaintiff Goldberg's wheels had bent, costing him $4,700 out of pocket.

---

[1] See Exhibit 1, https://www.yahoo.com/news/redemption-2017-chevrolet-corvette-grand-202000878.html (last visited September 8, 2020).

9. The Wheel Defect is inherent in each Class Vehicle and was present at the time of sale.

10. GM was well aware of the Wheel Defect. In fact, in 2017, a Class Vehicle owner wrote on CorvetteForum.com that "there have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend on a brand-new Grand Sport. In my situation, there was absolutely no damage, scratch, or even a mark anywhere—the wheel just went out of round with less than 1,000 miles on the car." In 2017, GM responded to this Class Vehicle owner with its stock line: blaming the customer for hitting a road hazard and denying the existence of any defect.

11. Although GM was sufficiently aware of the Wheel Defect from pre-production testing, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, this knowledge and information was exclusively in the possession of GM and its network of dealers and, therefore, unavailable to consumers.

12. Despite access to aggregate internal data, GM has actively concealed the existence of the defect, telling customers, as cited below, that the wheels are not defective and that the cracked and deformed wheels are caused by potholes or other driver error, without any such evidence to support external causes.

13. GM sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper

warranty. However, when class members bring their vehicles to GM's authorized dealerships requesting coverage for the Wheel Defect, GM is systematically denying coverage. As a result, Class Members are paying thousands of dollars out-of-pocket to repair, and if they purchase the replacements from GM, to replace the wheels with equally defective wheels.

14. The Wheel Defect is material because it poses a serious safety concern. Deformations in the rims progress to cracks, and cracked rims can cause the tire to fail and explode while driving, leading to a sudden loss of control at speed and a potential collision.

15. The Wheel Defect is also a material fact because consumers incur significant and unexpected repair costs. GM's failure to disclose material facts regarding the Wheel Defect at the time of purchase is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace defective wheels.

16. Had GM disclosed the Wheel Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles, would have paid less for them.

## II.    THE PARTIES

### **Plaintiff Richard Barrington**

17. Plaintiff Richard Barrington ("Barrington") is a California citizen who resides in Union City, California.

18. On or around March 29, 2018, Plaintiff Barrington purchased a new 2018 Chevrolet Corvette Grand Sport from Wittmeier Chevrolet, an authorized GM dealer in Chico, California.

19. Passenger safety and reliability were important factors in Plaintiff Barrington's decision to purchase his vehicle. Before making his purchase, Plaintiff Barrington researched the 2018 Chevrolet Corvette on GM's website and on GM's dealership websites. Based on his research, Plaintiff Barrington believed that the Corvette would be a safe and reliable vehicle.

20. GM's omissions were material to Plaintiff Barrington. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff Barrington would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff Barrington would not have purchased his vehicle, or would have paid less for it.

21. Within one or two months of his purchase, Plaintiff Barrington found that his right rear tire was leaking air. Plaintiff Barrington brought his vehicle back to Fremont Chevrolet. The dealership confirmed that the right rear rim was cracked in three places and replaced the rim.

22. In or around July or August of 2018, Plaintiff Barrington found that the rear driver's side rim was cracked. He brought his vehicle back to Fremont Chevrolet. Again, the dealership confirmed that the rim was cracked. GM refused to

6

cover the necessary rim replacement under warranty. Accordingly, Plaintiff Barrington purchased stock rims himself using the Facebook marketplace.

23. In or around August 2019, within 2,000 miles or purchase, those two rims had cracked.

24. On or around November 24, 2019, another of Plaintiff Barrington's rims cracked.

25. All told, Plaintiff Barrington has had to pay approximately $3,000 to replace six cracked rims on his vehicle.

26. At all times, Plaintiff Barrington, like all Class Members, has driven his Chevrolet Corvette in a manner both foreseeable and in which it was intended to be used

**Plaintiff Ernest Holguin**

27. Plaintiff Ernest Holguin ("Holguin") is a California citizen who resides in Benicia, California.

28. Plaintiff purchased his Corvette primarily for personal, family, or household use.

29. In December 2016, Plaintiff purchased a 2017 Chevrolet Corvette Grand Sport from Boardwalk Chevrolet, an authorized GM dealer in Redwood City, California. Plaintiff took delivery of his vehicle in California, and his vehicle is registered in California.

30. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff researched the 2017 Chevrolet Corvette Grand Sport by reviewing information on the vehicle from Kelley Blue Book, and by reviewing the website of the authorized GM dealership from which he purchased the vehicle. At the dealership, Plaintiff reviewed the vehicle's window sticker. Plaintiff also test drove a Chevrolet Corvette at an authorized GM dealership and spoke with multiple salespeople. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

31. GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

32. In March 2017, with approximately 10,000 miles on the odometer, Plaintiff first discovered a problem with his wheels that continues to plague his vehicle despite six wheel replacements. Specifically, he noticed cracks in the rear wheels that were causing the tires to lose air.

33. On August 18, 2017, with 14,000 miles on the odometer, Plaintiff brought his vehicle to Concord Chevrolet, an authorized GM dealership in Concord, California, complaining that his right rear wheel was cracked and losing air. The

dealership confirmed that the wheel was indeed cracked. In response, however, with no evidence to support its claims, the GM dealership told Plaintiff his vehicle must have been damaged by road hazards and refused to cover the necessary repair under warranty. However, Plaintiff is the sole driver of the vehicle, and his vehicle did not strike any road hazards, potholes, or other large road imperfections. Nevertheless, Plaintiff had to pay the GM dealership $1,007.01 to replace one wheel.

34. On October 27, 2017, with 23,028 miles on the odometer, Plaintiff returned to Concord Chevrolet complaining that his left rear tire was losing air. The dealership notified Plaintiff that the loss of air was occurring because his left rear wheel had cracked. Plaintiff had two cracks repaired in his rear left wheel at third-party mechanic 1stStop Auto in Brentwood, California. Plaintiff had to pay $150 for this repair.

35. On February 5, 2018, with 30,027 miles on the odometer, Plaintiff brought his vehicle back to Boardwalk Chevrolet, complaining that his left rear wheel was losing air. The dealership confirmed that the wheel had multiple cracks in the rim and notified plaintiff that he would need to replace the wheel. As a result, Plaintiff had to pay $933.92 for the wheel replacement on this visit.

36. Just five days later on February 10, 2018, with 30,479 miles on the odometer, Plaintiff brought his vehicle to Concord Chevrolet, complaining that his front wheel had cracked. The dealership balanced all four wheels and replaced the

tires at an out of pocket cost to Plaintiff of $2,424.66.

37. Twelve days after the costly wheel rebalancing and tire replacements, on February 22, 2018, with 30,789 miles on the odometer, Plaintiff's left rear tire was already leaking air. Plaintiff brought this vehicle back to Boardwalk Chevrolet and complained. The dealership found that the left rear tire had multiple cracks and would have to be replaced. Plaintiff had to pay $933.02 to replace the wheel on this occasion.

38. On September 13, 2018, with 41,281 miles on the odometer, Plaintiff brought his vehicle to Team Chevrolet, an authorized GM dealership in Vallejo, California, complaining that his right rear tire was leaking and losing pressure. The dealership confirmed that the air leak was caused by a crack in the wheel and charged Plaintiff $39.00 for the diagnosis.

39. On September 24, 2018, with 41,974 miles on the odometer, Plaintiff returned to Team Chevrolet and, per the dealership's instructions, paid $813.35 plus sales tax to replace the wheel.

40. On April 10, 2019, with 52,266 miles on the odometer, Plaintiff returned to Team Chevrolet, complaining that his right front tire was losing air. The dealer confirmed that the rim had multiple cracks and that the wheel and tire would need to be replaced. Plaintiff paid $730.00 plus tax for the wheel and tire replacement.

41. On October 21, 2019, with 62,905 miles on the odometer, Plaintiff

returned to Team Chevrolet, complaining that his left front tire's air pressure was low. The dealership confirmed that the front wheel was cracked and notified Plaintiff that his wheel and tire pressure monitoring system ("TPMS") sensor would need to be replaced. However, the replacement wheel was back-ordered. Accordingly, Plaintiff had to pay $405.00 for a rental car in the interim. When the replacement wheel and TPMS sensor arrived, Plaintiff had to pay an additional $783.49 for the repair.

42. On February 17, 2020, with 67,068 miles on the odometer, Plaintiff brought his vehicle back to Team Chevrolet. Plaintiff again notified the dealership that his right rear tire was losing pressure and asked the dealership to check the wheel rim for cracks. The GM dealership confirmed that the right rear rim was cracked and notified Plaintiff that his wheel would need to be replaced. Plaintiff had to pay $896.60 plus tax for the replacement on that occasion.

43. At all times, Plaintiff, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Christa Rochford**

44. Plaintiff Christa Rochford ("Rochford") is a citizen of Florida, who resides in Brandon, Florida.

45. On or around April 13, 2019, Plaintiff Rochford purchased a new 2019

11

Corvette Z06 from Regal Chevrolet, an authorized GM car dealer in Lakeland, Florida.

46. On or around March 25, 2020, when the vehicle had been driven approximately 5050 miles and thus was well within the 36 month/36,000 mile warranty period, Plaintiff Rochford noticed that three of her rims were bent and one was cracked. Plaintiff took her vehicle to Stingray Chevrolet in Plant City, Florida and, after the dealership inspected the vehicle, told Plaintiff Rochford that the three bent rims would need repair and the fourth rim which was cracked would need to be replaced. GM refused to cover the rim repairs or replacement under the Class Vehicle's warranty.

47. Plaintiff Rochford has paid approximately $1,500.00 to fix the bent and cracked rims on her Class Vehicle. At all times Plaintiff Rochford has driven her Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

48. When making the decision to purchase her Class Vehicle, Plaintiff Rochford relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty.

49. Plaintiff would not have purchased the vehicle if she was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff Phillip Mirenda**

50. Plaintiff Phillip Mirenda ("Mirenda") is a citizen of Illinois, who resides in Home Glen, Illinois.

51. On or around August 9, 2016, Plaintiff Mirenda purchased a new 2017 Corvette Grand Sport from Castle Chevrolet, an authorized GM car dealer in Villa Park, Illinois.

52. In or around early spring 2018, Plaintiff Mirenda noticed that the Class Vehicle was vibrating. Plaintiff Mirenda initially took the Class Vehicle to Discount Tire in Homer Glen, Illinois. At that time, it was determined that a rear rim was bent, and the rim was repaired. Subsequently, Plaintiff Mirenda experienced continued vibration and determined that three of the rims (two front and one rear) were bent and the fourth (rear) was now cracked. Plaintiff then purchased two OEM wheels to replace two of the bent wheels. After continued vibration problems, Plaintiff ultimately purchased four after-market wheels and placed the original four other wheels in his garage. Thereafter, on June 4, 2019, Plaintiff Mirenda took the four wheels to Apple Chevrolet in Oreland Park, to seek cost assistance from GM for the defects in the wheels, but GM denied the claim and refused to cover the rim replacement under the vehicle's warranty.

53. Overall, Plaintiff Mirenda has paid approximately $5,000 to fix and/or replace the cracked and bent rim(s) on his Class Vehicle.

54. At all times Plaintiff Mirenda has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

55. When making the decision to purchase his Class Vehicle, Plaintiff Mirenda relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff Alfred Lupis**

56. Plaintiff Alfred Lupis ("Lupis") is a Massachusetts citizen who resides in Brewster, Massachusetts.

57. On December 15, 2017, Plaintiff purchased a new 2017 Chevrolet Corvette Grand Sport from Schumacher Chevrolet, an authorized GM dealer in Little Falls, New Jersey. Plaintiff took delivery of his vehicle in Massachusetts, and his vehicle is registered in Massachusetts.

58. Plaintiff purchased his Corvette primarily for personal, family, or household use.

59. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff researched the 2017 Chevrolet Corvette Grand Sport on GM's official website, on dealership

websites, and through general Google searches. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

60. GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Rim Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Rim Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

61. In November 2018, with approximately 3,000 miles on the odometer, Plaintiff felt a vibration and heard a repeated thumping sound which commenced while driving, similar to that which he had experienced in other cars when his tires were flat in those other cars, and noticed that his tires, though not flat, were losing air quicker than usual. At no time did Plaintiff, who was the sole driver of the car, hit any road hazards, potholes, or other large road imperfections.

62. Plaintiff then brought his vehicle to Alloy Wheel Repair Specialists, an independent wheel repair business, complaining that his tires were leaking air and reporting a thumping sensation under his seat, as if his tires were going flat. The repair facility discovered that Plaintiff's rear wheel on the driver's side was warped. Plaintiff had to pay $115 out of pocket to have the wheel straightened.

63. Thereafter, on April 15, 2019, Plaintiff again experienced a cracked rim while driving and having hit no road hazards, potholes, or other large road

imperfections. He contacted Bill Box Chevrolet in Rochester Hills, MI searching for replacements wheels-- which are in high demand, on information and belief, because of the number of cracked or bent rims nationwide-- where he was charged $851.71 for a replacement wheel and sensor. Plaintiff would continue to experience cracked or bent wheels, however.

64. In early August 2019, Plaintiffs vehicle again began exhibiting rapid loss of air from its tires. Plaintiff had, in the interim from the last incident, again had not hit any road hazards, potholes, or other large road imperfections. Plaintiff delivered his vehicle to Tracy Chevrolet in Plymouth, MA on September 5, 2019, after confirming that date with one of GM's inspectors. After the inspection, Plaintiff was informed that three of his wheels were bent (two front and one rear). GM refused to cover replacements under warranty.

65. After waiting several weeks for replacement wheels to become available, which wheels are in high demand, on information and belief, because of the number of cracked or bent rims nationwide, on October 13, 2019 Plaintiff purchased replacement wheels from House of Wheels in Deerfield Beach, FL for $950, and had them installed at Cape Tire Service, Inc. in Hyannis, MA for $142.97.

66. In all, Plaintiff had to expend $1,944.68 to replace cracked and/or bent wheels.

67. At all times, Plaintiff, like other class members, has driven his vehicle in

a manner that was both foreseeable and in which it was intended to be used. At no

time had Plaintiff hit any potholes, large road imperfections, or other road hazards.

**Plaintiffs Robert and Carole Smith**

68. Plaintiffs Robert and Carole Smith ("Smith") are Massachusetts citizens

who reside in Eastham, Massachusetts.

69. In July 2018, Plaintiffs purchased a 2019 Chevrolet Corvette Grand Sport

LT2 from McMulkin Chevrolet, an authorized GM dealership in Nashua, New

Hampshire. Plaintiffs' vehicle is registered in New Hampshire.

70. Plaintiff purchased his Corvette primarily for personal, family, or

household use.

71. Passenger safety and reliability were important factors in Plaintiffs'

decision to purchase their vehicle. Before making their purchase, Plaintiffs reviewed

GM's official website regarding the 2019 Corvette Z06. At the GM dealership,

Plaintiffs reviewed the vehicle's window sticker and a brochure regarding the

vehicle. Plaintiffs also spoke with a salesperson at the GM dealership regarding the

Corvette. Plaintiffs believed that the Corvette would be a safe and reliable vehicle.

72. GM's omissions were material to Plaintiffs. Had GM disclosed its

knowledge of the Wheel Defect before they purchased their Corvette, Plaintiffs

would have seen and been aware of the disclosures. Furthermore, had they known

of the Wheel Defect, Plaintiffs would not have purchased their vehicle, or would

have paid less for it.

73. Immediately after purchase, while driving him from the dealership, the vehicle was vibrating and shimmying. The following day, Plaintiff Robert Smith contacted the dealer and complained about the vibration and shimmy. Without any evidence, the dealer claimed that Plaintiffs must have struck an object or road hazard. However, Plaintiffs had not struck any potholes or other road hazards.

74. The vibrations and shimmy continued, and Plaintiff Robert Smith complained to the dealership three or four more times within the first two months and 500 to 800 miles of ownership. The dealership repeatedly blamed impact damages, even though Plaintiffs had not struck any road hazards.

75. In or around September 2018, with approximately 1,500 miles on the odometer, Plaintiff Robert Smith complained to Beard Chevrolet in Hyannis, MA, that the vehicle was vibrating and shimmying. The dealership also blamed road hazards, without any evidence, and implied that Plaintiffs were racing their vehicle (which they were not).

76. In or around April or May of 2019, with approximately 2,000 miles on the odometer, Plaintiff Robert Smith complained of the vibration and shimmy to Tracey Chevrolet in Plymouth, MA, and the dealership there accused Plaintiffs of racing the vehicle. Plaintiffs have never raced their vehicle.

77. On September 25, 2019, with 6,993 miles on the odometer, Plaintiffs had

18

the wheels removed and tested at third-party automotive repair facility Cape Tire. Cape Tire confirmed that all four wheels were bent. As a result, Plaintiffs had to purchase four new Chevrolet Wheels at an out of pocket cost of $1,850 from a vendor in Florida and paid an additional $254.88 for installation. Plaintiffs also had to pay $87.12 for the diagnosis of the bent wheels.

78. At all times, Plaintiffs, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Eric Czajka**

79. Plaintiff Eric Czajka ("Czajka") is a citizen of Michigan, who resides in Grosse Ile, Michigan.

80. On or around May 7, 2018, Plaintiff Czajka purchased a certified pre-owned 2017 Corvette Z06 with approximately 11,581 miles on it from Jeff Schmitt Chevrolet East, an authorized GM car dealer in Dayton, OH.

81. On or around December 9, 2019, when the vehicle had approximately 23,000 miles on it, Plaintiff Czajka noticed that the rear driver's side tire was losing air and the vehicle had a vibration coming from the rear driver's side. Plaintiff Czajka took his vehicle to Belle Tire in Woodhaven, MI and, after the tire center investigated the cause, Plaintiff Czajka was informed that the issue was caused by the fact that the driver's side rear rim was cracked and would need to be replaced.

Plaintiff then contacted Dick Genthe Chevrolet, an authorized GM car dealer located in Southgate, MI, who informed Plaintiff Czajka that the cracked wheel is not covered by the manufacturer's warranty. GM refused to cover the rim replacement under the vehicle's warranty.

82. After replacement of the rear driver's side rim, Plaintiff Czajka's Class Vehicle continues to lose air pressure in the recently replaced driver's side rear rim, despite no punctures or imperfections in the driver's side rear tire.

83. Plaintiff Czajka paid a $184.92 deductible as part of a third-party wheel and tire protection policy he had previously obtained to fix the cracked rim on his Class Vehicle.

84. Very recently, the rear passenger side rim also cracked on Plaintiff's Class vehicle.  Plaintiff called Chevrolet but has not heard back.  Plaintiff is working to secure a replacement rim with Belle Tire as he previously did with his driver side rear wheel.

85. At all times Plaintiff Czajka has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

86. When making the decision to purchase his Class Vehicle, Plaintiff Czajka relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would

not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff James Kalkstein**

87. Plaintiff James Kalkstein ("Kalkstein") is a Michigan citizen who resides in Rochester Hills, Michigan.

88. In May 2016, Plaintiff purchased a 2016 Chevrolet Corvette Z06 from Buff Whelan Chevrolet, an authorized GM dealer in Sterling Heights, Michigan. Plaintiff took delivery of his vehicle in Michigan, and his vehicle is registered in Michigan.

89. Plaintiff purchased his Corvette primarily for personal, family, or household use.

90. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed GM's official website regarding the 2016 Corvette Z06. At the GM dealership, Plaintiff reviewed the vehicle's window sticker and a brochure regarding the vehicle. Plaintiff also spoke with a salesperson at the GM dealership regarding the Corvette. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

91. GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the

Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

92. On May 10, 2018, with approximately 15,087 miles on the odometer, Plaintiff brought his vehicle back to Buff Whelan Chevrolet complaining that the rear wheel was cracked. The dealership verified the complaint, and GM covered a portion of the replacement under warranty. However, Plaintiff had to contribute $416.50 out of pocket.

93. On October 17, 2019, Plaintiff brought his vehicle back to Buff Whelan Chevrolet, again complaining that his right rear wheel had cracked. The dealership verified the concern and replaced the wheel at an out of pocket cost of $729.00 to Plaintiff.

94. At all times, Plaintiff, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff David Goldberg**

95. Plaintiff David Goldberg ("Goldberg") is a New Hampshire citizen who resides in Merrimack, New Hampshire.

96. In June 2019, Plaintiff purchased a 2019 Chevrolet Corvette Grand Sport from MacMulkin Chevrolet, an authorized GM dealership in Nashua, New Hampshire. Plaintiff took delivery of his vehicle in New Hampshire, and his vehicle

is registered in New Hampshire.

97. Plaintiff purchased his Corvette primarily for personal, family, or household use.

98. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff did general internet searches regarding the 2019 Corvette Grand Sport, including reviewing GM's official website and an authorized GM dealership's website. At the GM dealership, Plaintiff reviewed the vehicle's window sticker and a brochure regarding the Corvette. Plaintiff also spoke with a salesperson at the GM dealership regarding the Corvette. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

99. GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

100. In or around August 2019, with approximately 1,110 miles on the odometer, Plaintiff brought his vehicle back to MacMulkin Chevrolet complaining that his vehicle was vibrating when driving. The dealership inspected Plaintiff's vehicle and discovered that, after only around 1,100 miles of driving, three out of his four wheels were bent. With no evidence to support its claims, the GM dealership

told Plaintiff that he must have hit a pothole, and that Plaintiff would have to pay for the replacement rims. However, Plaintiff is the sole driver of the vehicle, and his vehicle did not strike any road hazards, potholes, or other large road imperfections. Nevertheless, Plaintiff had to pay $4,700 to have the wheels replaced at Wheel Lab, a third-party automotive repair facility.

101. At all times, Plaintiff, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Steven M. Chookazian**

102. Plaintiff Steven M. Chookazian (Chookazian") is a citizen of New Jersey, who resides in Ramsey, New Jersey.

103. On or around July 18, 2018, Plaintiff Chookazian purchased a certified pre-owned 2017 Corvette Grand Sport with approximately 3,700 miles from David McDermott Chevrolet, an authorized GM car dealer in East Haven, CT.

104. Beginning in or around February 2020 through March 2020, when the vehicle had approximately 14,000 miles on it, Plaintiff Chookazian noticed that he was having low tire pressure. On March 13, 2020, Plaintiff Chookazian took the Class Vehicle to Economy Tire in Jupiter, Florida where he was advised that his right rear tire was cracked and was not repairable. Plaintiff then took his vehicle to Wallace Chevrolet in Stuart Florida and, after the dealership investigated the cause,

was informed that the issue was caused by the fact that the rear rim was cracked and would need to be replaced. Although the vehicle was within the warranty period, GM refused to cover the rim replacement under the vehicle's warranty.

105. On March 26, 2020, Plaintiff Chookazian paid approximately $1,000.00 to have the cracked rim replaced on his Class Vehicle at Wallace Chevrolet.

106. At all times Plaintiff Chookazian has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

107. When making the decision to purchase his Class Vehicle, Plaintiff Chookazian relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**<u>Plaintiff Troy Williams</u>**

108. Plaintiff Troy Williams ("Williams") is a citizen of New York, who resides in Bronxville, New York.

109. On or around May 16, 2017, Plaintiff Williams purchased a new 2017 Corvette Z06 from Curry Chevrolet, an authorized GM car dealer in Scarsdale, NY.

110. On or around October 27, 2019, when the vehicle had approximately

5,000 miles on it, Plaintiff Williams noticed that air was leaking from the tire and the rim was cracked when he went to a flat fix to change the tire. Plaintiff thereafter took his vehicle to Curry Chevrolet to have the rim replaced and, GM refused to cover the rim replacement under the vehicle's warranty.

111. At the time, Plaintiff Williams was not able to have the cracked rim replaced because Curry Chevrolet had no rims available. As a result, Plaintiff Williams was not able to drive his vehicle for several months.

112. At all times Plaintiff Williams drove his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

113. When making the decision to purchase his Class Vehicle, Plaintiff Williams relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff Joseph Bossart**

114. Plaintiff Joseph Bossart ("Bossart") is a citizen of Pennsylvania, who resides in Erie, Pennsylvania.

115. On or around January 29, 2018, Plaintiff Bossart purchased a new 2018 Corvette Grand Sport through MacMulkin Chevrolet, an authorized GM car dealer

located in Nashua, NH. The car was delivered to Pennsylvania for pickup by Plaintiff at McQuillen Chevrolet dealership in Girard, PA.

116. On or around August 22, 2019, when the vehicle had approximately 3,100 miles on it, Plaintiff Bossart noticed a vibration in the steering wheel and dashboard. Plaintiff took his vehicle to McQuillen on August 29, 2019 to investigate the vibration issue and, after the dealership investigated the cause, was informed that the issue was caused by the fact that three of Plaintiff Bossart's rims were bent (the front two and the right rear) and would need repair. GM refused to cover the rim repair under the vehicle's warranty.

117. Plaintiff Bossart paid approximately $450.00 to Alloy Wheel Repair located in Berea, Ohio to fix the bent rims on his Class Vehicle.

118. At all times, Plaintiff Bossart has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

119. When making the decision to purchase his Class Vehicle, Plaintiff Bossart relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff Bossart would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff Michael Roth**

120. Plaintiff Michael Roth ("Roth") is a Pennsylvania citizen who resides in Clarks Summit, Pennsylvania.

121. On May 28, 2018, Plaintiff purchased a 2018 Chevrolet Corvette Grand Sport from Valley Chevrolet, an authorized GM dealership in Wilkes-Barre, Pennsylvania.

122. Plaintiff purchased his Corvette primarily for personal, family, or household use.

123. Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed GM's official website regarding the 2018 Chevrolet Corvette Grand Sport. At the GM dealership, Plaintiff reviewed the vehicle's window sticker. Plaintiff also spoke with a salesperson at the GM dealership regarding the Corvette and went on a lengthy test drive with the dealership salesperson. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

124. GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle.

125. By November 2018, Plaintiff's vehicle was vibrating. He brought his

vehicle back to Valley Chevrolet and complained of the vibration. The dealership confirmed that his two left side wheels were bent but refused to cover the repairs under warranty and told Plaintiff instead to hire a third-party wheel repair specialist in order to have the required repairs performed. Accordingly, Plaintiff hired Alloway Wheel Repair Specialists, who attempted to repair the bent wheels. Plaintiff had to pay $318 for this repair. Despite this repair, the vibration continued.

126. In or around March 2020, Plaintiff brought his vehicle to an independent third-party tire repair facility complaining of continued vibration. The repair facility inspected his right rear wheel and determined that it was severely bent.

127. Because the wheel repairs were ineffective, Plaintiff had to purchase four new wheels at an out of pocket cost of $3,665.00.

128. At the time of drafting this complaint, Plaintiff's vehicle has only approximately 12,500 miles on the odometer.

129. At all times, Plaintiff, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Dennis Glazer and Marianne Glazer**

130. Plaintiffs Dennis Glazer and Marianne Glazer ("Glazer") are Ohio citizens who reside in Canton, Ohio.

131. In September 2017, Plaintiff Marianne Glazer purchased a 2018

Chevrolet Corvette Z06 from Scharchone Chevrolet, an authorized GM dealership in Rootstown, Ohio.

132. Plaintiff purchased the Corvette primarily for personal, family, or household use.

133. Passenger safety and reliability were important factors in Plaintiff's decision to purchase the vehicle. Before making the purchase, Plaintiff Dennis Glazer went to the dealership and spoke with an authorized dealership representative regarding Corvette's options. Plaintiff Marianne Glazer also spoke with an authorized dealership representative regarding the vehicle prior to purchase. Plaintiffs believed that the Corvette would be a safe and reliable vehicle.

134. GM's omissions were material to Plaintiffs. Had GM disclosed its knowledge of the Wheel Defect before purchase, Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Wheel Defect, Plaintiffs would not have purchased their vehicle, or would have paid less for it.

135. In April 2019, with approximately 6,750 miles on the odometer, the Corvette's front right wheel cracked. Plaintiff Dennis Glazer complained to his local authorized GM dealership, but the dealership refused to cover any repairs or replacements under warranty, stating that GM specifically excluded "that" from the warranty (without specifying what "that" meant).

136. Given that GM and its authorized dealership refused to cover the costly

repairs under warranty, Plaintiffs had no choice but to bear the expense themselves. Plaintiffs paid $840.57 to have the cracked wheel replaced at Tire Source Belden Village, a third-party automotive repair facility.

137. In August 2019, with approximately 9,150 miles on the odometer, the vehicle's left rear wheel cracked. Plaintiff Dennis Glazer again complained to his local authorized GM dealership, but the dealership again refused to cover any repairs or replacements under warranty. Accordingly, as before, Plaintiffs brought their vehicle to Tire Source Belden Village and paid $848.27 to have the cracked wheel replaced.

138. At all times, Plaintiffs, like other class members, has attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Derrol Turner**

139. Plaintiff Derrol Turner ("Turner") is a citizen of South Carolina, who resides in Goose Creek, SC.

140. On or around September 2016, Plaintiff Turner purchased a new 2017 Corvette Grand Sport from Crews Chevrolet, an authorized GM car dealer in North Charleston, SC.

141. On or around January 25, 2020, when the vehicle had approximately 14,436 miles on it, Plaintiff Turner noticed that air was leaking from the tire. Plaintiff

took his vehicle to Crews Chevrolet and, after the dealership investigated the cause, was informed that the issue was caused by the fact that the rear passenger rim was cracked and would need to be replaced. GM refused to cover the rim replacement under the vehicle's warranty.

142. Plaintiff Turner has paid approximately $826.00 to fix the cracked rim on his Class Vehicle.

143. At all times Plaintiff Turner has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

144. When making the decision to purchase his Class Vehicle, Plaintiff Turner relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Plaintiff Ronnie E. Barker**

145. Plaintiff Ronnie E. Barker ("Barker") is a citizen of Texas, who resides in Plano, Texas.

146. On or around January 12, 2016, Plaintiff Barker purchased a certified pre-owned 2015 Corvette Z06 with approximately 4,600 miles from Chuck Fairbanks Chevrolet in Desota, Texas.

147. On or around November 8, 2018, Plaintiff Barker noticed that his tire was leaking air. Plaintiff took his vehicle to Richardson Chevrolet in Richardson, Texas and, after the dealership investigated the cause, was informed that the issue was caused by the fact that the rim was cracked and would need to be replaced. GM refused to cover the rim replacement under the vehicle's warranty.

148. Plaintiff Barker ultimately took the Class Vehicle to Wheel Technologies in Dallas, Texas to have the cracked rim replaced.

149. Plaintiff Barker paid approximately $584.00 to have the cracked rim on his Class Vehicle replaced.

150. At all times Plaintiff Barker has driven his Class Vehicle in a foreseeable manner and consistent with the manner in which it was intended to be driven.

151. When making the decision to purchase his Class Vehicle, Plaintiff Barker relied on GM's representations that it was a safe and reliable vehicle and was covered by a 36 month/36,000 mile bumper-to-bumper warranty. Plaintiff would not have purchased the vehicle if he was aware of the defect in the vehicle's rims that would not be covered under warranty, or would not have been willing to pay as much for the vehicle.

**Defendant**

152. Defendant General Motors LLC is a Delaware limited liability company with its principle place of business located at 300 Renaissance Center, Detroit,

Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principle place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

153. General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

154. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components throughout the United States of America.

## III.   JURISDICTION AND VENUE

155. This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the

sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. §
1332(d)(2)(A).

156. In addition, under 28 U.S.C. § 1367, this Court may exercise
supplemental jurisdiction over the state law claims because all of the claims are
derived from a common nucleus of operative facts and are such that plaintiffs would
ordinarily expect to try them in one judicial proceeding.

157. This Court has specific personal jurisdiction over GM because it
maintains its headquarters and principal place of business in this district. Thus,
Defendant has purposefully availed itself of the benefits and protections of this
jurisdiction by continuously and systematically conducting substantial business in
and from this judicial district, directing advertising and marketing activities from
within this district, and intentionally and purposefully placing Class Vehicles into
the stream of commerce within Michigan and throughout the United States.
Numerous class vehicles have been sold within Michigan and many within this
judicial district.

158. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391
because GM transacts business in this district, is subject to personal jurisdiction in
this district, and therefore is deemed to be a citizen of this district. GM has authorized
dealers in this district, has advertised in this district and has received substantial
profits from its sales and leases of vehicles in this district. Therefore, a substantial

and material part of the events giving rise to these claims occurred in this district

## IV. FACTUAL ALLEGATIONS

159. Since 2014, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Delaware and nationwide. GM warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

### A. The Defect

160. The wheel is a large metal circle on which the tire is placed. The wheel helps create the shape of the tire and allows it to be mounted to the vehicle.

161. GM equipped the Class Vehicles with cast aluminum alloy rims. Figure one, below, shows the OEM rims for the Chevrolet Corvette Grand Sport.



**Figure 1**

162. The Vehicles' wheels are prone to warping and cracking at extremely low mileages. For example, Plaintiffs Robert and Carole Smith's vehicle was vibrating and shimmying immediately after purchase, and Plaintiff Goldberg had to pay $4,700 to replace three of his wheels with only approximately 1,100 miles on the odometer.

163. The following complaint to NHTSA describes the circumstance well:

> Noticed a vibration in the car at highway speeds. Took the vehicle into the dealer and was told that the wheel was bent. Service manager stated that this was happening to many Corvettes and was due to the stiffness of the tire and the weakness of the factory wheel. GM has denied a claim under warranty.

*See* paragraph 41(l), *infra*.

164. On information and belief, the Wheel Defect occurs because GM, in designing and manufacturing the Class Vehicles (which are sub-models of the Corvette line), used wheels that are of a cheaper material that is cast, rather than forged, and is of insufficient strength, and in an insufficient quantity, to withstand the torque and power input from the drivetrain. GM used less material than necessary in order to try to save un-sprung weight (i.e., weight that is not borne by the vehicle's suspension). As a result, the rims are not strong enough and crack and deform under normal driving conditions.

165. On information and belief, the defect manifests in the following way: The center plate becomes non-axial with outer periphery of the rim at the outboard

37

and inboard rim flanges and bead-seats (*i.e.,* where the rim and tire meet and create

an air-tight seal). This causes the wheel to rotate with a wobble.

    a) The rim flange of the rim on the inboard and outboard

        circumferences deforms, thus creating a non-circular or "egg"

        shape.

    b) The rims crack in the barrel section, between the inner and outer

        bead seat.

166. Wobbling conditions, out of round conditions, and deformation of the

rim flange cause vibration perceptible to the driver through the body of the vehicle

and through the steering wheel at various speeds. Cracks in the barrel cause a loss

of air pressure and an unsafe condition and cause the rim to lose strength and become

vulnerable to failure under loading conditions such as braking.

167. The problem is widespread. In a section entitled "Wheel Woes," Car &

Driver magazine reported that, during the initial stages of Car & Driver's review of

a 2017 Chevrolet Corvette Grand Sport, the vehicle suffered three bent rims and a

$1,119 repair bill:

> Shortly after its first trip to the test track, however, the
> Grand Sport showed signs of an ailment that would dog us
> throughout our time with the car. At just under 6500 miles
> we discovered that three of its wheels were bent. Two were
> repaired, but one was cracked and had to be replaced. In

all, that was an $1119 trip to the Corvette cobbler, none of which was covered by warranty.[2]

168. In all, Car & Driver spent $4,098 on wheel repair and replacement-seven repairs and three replacements on the single vehicle they reviewed, for an average failure rate of once every 4000 miles.

169. The Wheel Defect alleged is inherent in and the same for all Class Vehicles.

### B.  The Wheel Defect Poses a Serious Safety Concern

170. The Wheel Defect is material to consumers because it presents a serious safety concern. Deformations in the rims progress to cracks, and cracked rims can cause the tire to fail and explode while driving, leading to a sudden loss of control at speed and a potential collision. In addition, bent rims can cause the vehicle to vibrate which makes the vehicle less stable and can cause driver distraction.

### C.  GM Had Superior and Exclusive Knowledge of the Wheel Defect

171. GM is aware of the Wheel Defect and tells its customers that the wheels are not defective and that the cracks and deformations are caused by the drivers. GM is also refusing to cover the Wheel Defect under warranty.

172. Corvette owners communicate through online forums such as www.CorvetteForum.com. GM monitors these online forums and communicates

---

[2] See Ex. 1.

with its customers. For example, on August 31, 2017, a Corvette Grand Sport owner wrote:

> There have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend on a brand new Grand Sport. In my situation, there was absolutely no damage, scratch or even a mark anywhere—the wheel just went out of round with less than 1,000 miles on the car.
>
> Why is this happening, is Chevy aware of this happening on more than an isolated occurrence, and what is being done to remedy the situation?[3]

173. On October 18, 2017, GM responded by denying that there had been a "rash" of wheel failures, denying the existence of a defect, and blaming the customer: "A frequent sequence of events is that a wheel gets bent by a road hazard but the damage is initially undetectable to the driver…. Over time fatigue cracks can form after thousands or even millions of cycles."[4] With respect to a remedy, GM only stated that "we will continuously improve our designs and validation procedures based on how the world is changing."

174. The fact that GM responded to class members' complaints online in 2017 conclusively establishes GM's knowledge.

175. To date, GM continues to refuse to cover the Wheel Defect under

---

[3] See Exhibit 2, https://www.corvetteforum.com/forums/ask-tadge/4036656-asked-grand-sport-z06-wheels-bending.html

[4] See Exhibit 3, https://www.corvetteforum.com/forums/ask-tadge/4055813-answered-grand-sport-z06-wheels-bending.html

warranty and has not issued any relief to the customers who have had to pay thousands out-of-pocket as a result.

176. GM also monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

177. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints about the Wheel Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Wheel Defect.

178. The following are some examples of the scores of complaints concerning the Wheel Defect available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that GM, through its network of dealers and repair technicians,

was made aware of the cracked and deformed rims. In addition, the complaints

indicate that despite having knowledge of the defect and the exact vehicles affected,

GM blamed the customer and refused to honor its 3-year, 36,000-mile bumper-to-

bumper warranty.

a. **DATE OF INCIDENT**: July 20, 2017
DATE COMPLAINT FILED: September 21, 2017
NHTSA/ODI ID: 11024830
**SUMMARY:** MY 2016 CORVETTE STARTED HAVING HIGH FREQUENCY VIBRATIONS IN STEERING WHEEL AND INTERIOR PANELS WITH UNDER 7900 MILES OF SERVICE. I COMPLAINED TO THE DEALERSHIP SERVICE DEPARTMENT ABOUT THE PROBLEM AND FOUND FRONT WHEELS TO BE BENT AND COULD NOT BALANCE THE WHEELS PROPERLY. THE DEALERSHIP ADVISED ME TO TAKE MY CORVETTE TO ANOTHER DEALERSHIP THAT HAD BETTER EQUIPMENT THAN THEM. THE SECOND DEALERSHIP INSPECTED MY CORVETTE AND INFORMED ME THAT ALL FOUR WHEELS ARE BENT AND CANNOT BALANCE THEM PROPERLY. NEITHER DEALERSHIP WILL REPLACE THE WHEELS UNDER WARRANTY. THUS FAR, GM AS WELL, WILL NOT REPLACE WHEELS UNDER WARRANTY. I ATTEST THAT I HAVE NOT DRIVEN MY CORVETTE ABNORMALLY NOR HAVE HIT OBSTRUCTIONS OR POT HOLES. I HAVE NEVER DRIVEN MY CORVETTE ON ROUGH, GRAVEL OR DIRT ROADS. I DO BELIEVE THIS IS A VERY SERIOUS SAFETY PROBLEM THAT CHEVROLET AND GM SHOULD ADDRESS BEFORE SOMEONE HAS A TERRIBLE ACCIDENT BECAUSE OF THESE WHEELS!

b. **DATE OF INCIDENT**: August 19, 2017
**DATE COMPLAINT FILED**: September 20, 2017
NHTSA/ODI ID: 11024700
**SUMMARY**: BOTH LEFT WHEELS ON MY 2017 GRAND SPORT BENT IN NORMAL DRIVING OVER NORMAL ROADS. IN RESEARCHING THE ISSUE, THIS SEEMS TO BE A RECURRING PROBLEM WITH THE STOCK WHEELS ON 2017-2018 CORVETTE GRAND SPORTS AND 2015-18 CORVETTE Z06S. GM AGREED TO REPLACE

THE FRONT WHEEL, BUT THE DEALER DIDN'T REALIZE THE REAR WAS ALSO BENT (NO VISIBLE DAMAGE TO EITHER WHEEL, THE WHEELS ARE JUST NOT STRONG ENOUGH). GM IS NOW CLAIMING THEY WON'T FIX/REPLACE THE REAR WHEEL. CAR VIBRATES BECAUSE OF THE BENT WHEEL.

c.  **DATE OF INCIDENT**: October 13, 2017
    DATE COMPLAINT FILED: October 20, 2017
    NHTSA/ODI ID: 11035178
    **SUMMARY**: TL* THE CONTACT OWNS A 2015 CHEVROLET CORVETTE. WHILE THE CONTACT WAS HAVING TIRES INSTALLED AT BILL STASEK CHEVROLET (700 W DUNDEE RD, WHEELING, IL), HE WAS INFORMED THAT ALL THE RIMS WERE CRACKED AND THE REAR PASSENGER WHEEL WAS LEAKING. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS APPROXIMATELY 13,466.

d.  **DATE OF INCIDENT**:  December 20, 2017
    DATE COMPLAINT FILED: October 18, 2018
    NHTSA/ODI ID: 11141356
    **SUMMARY**: CRACKED REAR WHEEL. I PURCHASED THE CAR USED AND THIS WAS DISCOVERED DURING AN INSPECTION.

e.  **DATE OF INCIDENT**:  January 8, 2018
    DATE COMPLAINT FILED: January 10, 2019
    NHTSA/ODI ID: 11166176
    **SUMMARY**: BOTH OF MY OEM REAR WHEELS (SPECTRA GRAY - 10 SPOKE), HAVE DEVELOPED CRACKS REQUIRING REPLACEMENT AT MY EXPENSE. DESPITE MY CORVETTE BEING ON WARRANTY AND A HIGH PERFORMANCE, SPORTS CAR WHICH IS REGULARLY SERVICED, THE CHEVROLET DEALERSHIP REFUSES TO REPLACE THESE WHEELS, EXCEPT AT MY EXPENSE, CITING THAT POOR ROAD CONDITIONS IN CALIFORNIA ARE BLAME FOR THE FRACTURES, RUNNING HORIZONTALLY ON THE RIM LIP. THE FRACTURES CREATE A VERY DANGEROUS SITUATION GIVEN HIGH TORQUE LEVELS, LOW PROFILE TIRES WITH A WIDE STANCE. THE TIRES AND THE SUSPENSION ARE DESIGNED FOR HIGH PERFORMANCE, AND HIGH G FORCE, BUT WHEELS

ARE APPARENTLY FLAWED FOR THE DESIGNED TOLERANCES IMPOSED BY DRIVING A HIGH PERFORMANCE CORVETTE. MY CAR RAPIDLY LOSS AIR PRESSURE AT FREEWAY SPEEDS AND THE AIR PRESSURE WARNING LIGHT ACTIVATED IN BOTH OCCASIONS, WARNING OF THE HAZARDOUS CONDITION.

f.  **DATE OF INCIDENT**:  February 2, 2018
DATE COMPLAINT FILED:  February 6, 2018
NHTSA/ODI ID: 11067302
**SUMMARY**: I PURCHASED AN OPTIONAL CHROME WHEEL UPGRADE WHICH WAS DELIVERED WITH NEW VEHICLE. RIGHT REAR WHEEL CRACKED AND LOST AIR PRESSURE AFTER 4,000 MILES, LEFT REAR WHEEL CRACKED AND LOST AIR PRESSURE AFTER 6,800 MILES.

g.  **DATE OF INCIDENT**:  June 11, 2018
DATE COMPLAINT FILED:  July 5, 2018
NHTSA/ODI ID: 11109750
**SUMMARY**: BOTH REAR WHEELS DEVELOPED CRACKS APPROXIMATELY TWO INCHES LONG FROM THE INSIDE EDGE TOWARD THE MIDDLE OF THE WHEEL. THE CRACKS IN BOTH WHEELS WERE SIMILAR IN SIZE AND LOCATION. MILEAGE WHEN NOTICED WAS 24,000. NUMEROUS REPORTS OF THE SAME ISSUE ARE BEING REPORTED ON CORVETTE RELATED                                  WEB                                  SITES.

h.  **DATE OF INCIDENT**: August 4, 2018
**DATE COMPLAINT FILED**: September 27, 2018
NHTSA/ODI ID: 11131995
**SUMMARY**: HAD 3 OF THE 4 RIMS BEND, PER THE DEALER DIAGNOSIS, FOR NO APPARENT REASON. CAR HAD 2,000 MILES ON IT. IT SEEMS TO BE A SYSTEMIC PROBLEM. THERE ARE MULTIPLE POSTS ABOUT THIS ISSUE, ALONG WITH THE WHEELS CRACKING FOR NO REASON, AT THE FOLLOWING INTERNET FORUM;

HTTPS://WWW.CORVETTEFORUM.COM/FORUMS/C7-GENERAL-DISCUSSION-142/

IN MY INSTANCE THE CAR DROVE FINE THE EVENING BEFORE (I'D ACTUALLY PICKED IT UP FROM THE

DEALER THE SAME DAY AS THEY REPAIRED ANOTHER ISSUE). GOT IN THE CAR THE NEXT MORNING TO GO TO WORK AND NOTICED THE BAD VIBRATION. I THOUGHT A WHEEL WEIGHT HAD FALLEN OFF. TOOK IT TO THE DEALER AND AFTER DIAGNOSIS THEY INFORMED ME THAT 3 OF THE 4 RIMS WERE BENT (BOTH PASSENGER SIDE AND DRIVER REAR).

i. **DATE OF INCIDENT**: August 5, 2018
DATE COMPLAINT FILED: October 18, 2018
NHTSA/ODI ID: 11141268
**SUMMARY**: GM IS PUTTING DEFECTIVE WHEELS ON GRAND SPORT AND Z06 CORVETTES. THESE WHEELS WILL NOT WITHSTAND NORMAL DRIVING ON ANY HIGHWAY. THE ISSUE IS THAT THESE WHEELS BEND ON IMPACT, BE IT EXPANSION JOINTS ALONG BRIDGES OR SMALL IMPERFECTIONS IN THE ROADWAY THAT OTHER CARS HANDLE EVERY DAY.

THE ISSUE IS THAT GM SAYS THESE ARE ROAD HAZARDS AND THEY ARE NOT RESPONSIBLE. THE WHEELS WERE NOT ENGINEERED TO TAKE NORMAL DRIVING ON ROADS ANYWHERE.

THIS STARTED IN JUNE AFTER A TRIP I TOOK AND THE CAR PICKED UP A VIBRATION. TOOK IT TO S DEALER AND HE SAID THE WHEELS WERE BENT AND NOT COVERED UNDER WARRANTY AND WOULD SELL ME NEW ONES 2 FRONT WHEELS FOR ABOUT $1800. I THEN TOOK THE CAR HOME AND TOOK THE FRONT WHEELS OFF AND HAD THEM STRAIGHTENED AT A COST OF $110 EACH. I THOUGHT THAT TOOK CARE OF THE PROBLEM SO WE DROVE THE CAR ON ANOTHER TRIP TO NOVA SCOTIA, CANADA. WE WERE ON A TRIP AND LOST AIR IN THE LEFT FRONT TIRE (PICTURE BELOW) IT HAD WORN ALL THE WAY DOWN THROUGH ALL THE BELTS DUE TO THE WHEELS BEING BENT AGAIN. SEE ALL 3 PICTURES.

THESE WHEELS ARE A SAFETY HAZARD FOR THESE CARS TO USE ON PUBLIC HIGHWAYS AS THEY DEVELOP CRACKS AND CAUSE SEVERE TIRE WEAR IN SHORT PERIODS OF TIME.

I HAD ANOTHER SET OF BRAND NEW WHEELS AT HOME. I HAD TO COME BACK HOME AND GET THEM AND TAKE THEM BACK TO CANADA TO GET MY CAR HOME. ON THE 1700 MILE TRIP BACK THE CAR DEVELOPED A VIBRATION AND WHEN I TOOK IT BACK TO MY TIRE DEALER HE SAID THAT THE RIGHT FRONT WHEEL WAS BENT.

THE BIG ISSUE IS GM DOES NOT TRACK THESE ISSUES IF YOU DO NOT BUY THE NEW WHEELS FROM THEM AND IT GOES UNREPORTED. A FRIEND OF MINE WHO HAS LESS THAN 5000 MILES ON HIS 2019 NEEDS TO BUY 4 WHEELS AND 4 TIRES AND THE DEALER EVEN TOLD US THERE WERE 2 PEOPLE THE WEEK BEFORE THAT HAD BENT RIMS ON I-71.

j. **DATE OF INCIDENT**: August 25, 2018
DATE COMPLAINT FILED: November 2, 2018
NHTSA/ODI ID: 11145056
**SUMMARY**: AFTER DRIVING THE CAR THE TIRE PRESSURE WARNING CAME ON AND WE STARTED NOTICING THE TIRE PRESSURE LEAKING ON THE RIGHT REAR OF MY WIFE GRAND SPORT CORVETTE, THE WHEEL WAS TAKEN OFF TO INVESTIGATE THE CAUSE OF LEAK. IT WAS DISCOVERED THAT THERE WAS A CRACK ALONE THE BEAD RING AREA OF THE INSIDE DRUM AREA OF THE WHEEL. THE DEALERSHIP REFUSED TO COVER UNDER WARRANTY AND DIDN'T OFFER REPAIRS. THE WHEEL WAS TAKEN TO A REPUTABLE WHEEL REPAIR SHOP WITH A GUARANTEE ON THE REPAIR. AFTER DRIVING THE CAR APPROXIMATELY 1000 MILE THE SAME WHEEL STARTED TO LEAK AGAIN. AFTER REMOVING THE WHEEL THERE WAS ANOTHER CRACK APPROXIMATELY 180 DEGREES FROM THE REPAIRED CRACK. AFTER REFUSING TO DRIVE THE VEHICLE TO THE DEALERSHIP WITH A CRACKED WHEEL, IT WAS REMOVED FROM THE CAR AND TAKEN TO THE DEALERSHIP AND ALSO CALLED THE GM PRIORITY CARE AT 866-636-2273. GM PRIORITY CARE GAVE ME THE CASE NUMBER 8-4778215369 . THE DEALERSHIP STILL REFUSED TO COVER THE WHEEL UNDER WARRANTY BUT OFFERED TO SELL ME ANOTHER WHEEL FOR $250. THE VEHICLE CURRENTLY HAS 19000MILES AND IS MY WIFE'S DAILY DRIVER FOR

WORK. THE CAR HAS NOT BEEN ABUSED OR INVOLVED IN ANY ACCIDENTS. IT HAS BEEN PAINTED DUE TO SCRATCHES FROM TORNADO WIND DAMAGE. I TOOK PICTURES BEFORE THE REPAIR WAS MADE AND ADDITIONAL PICTURE OF THE SECOND CRACK IN THE SAME WHEEL. IN MY OPINION THE DEALERSHIP SHOULD HAVE REPLACED THE WHEEL WHEN THE FIRST CRACK OCCURRED. NOW I HAVE NO CONFIDENCE IN THE QUALITY OF THE GRAND SPORT WHEELS AND WILL REFUSE THEIR OFFER OF GETTING A WHEEL FOR $250. AFTER CHECKING WITH AN AFTERMARKET WHEEL COMPANY FOR REPLACEMENT WHEELS, THEY NOTIFIED ME THAT GM IS AWARE THERE IS AN ISSUE WITH THE GRAND SPORT WHEEL AND THAT I SHOULD TAKE IT TO THE DEALERSHIP FOR REPLACEMENT. THE CAR IS CURRENTLY NOT SAFE TO DRIVE UNTIL I GET A REPLACEMENT WHEEL. SEE ATTACHED PHOTOS OF THE FIRST AND SECOND CRACK IN THE WHEEL.

k.  **DATE OF INCIDENT**:  September 14, 2018
    **DATE COMPLAINT FILED**: September 26, 2018
    NHTSA/ODI ID: 11131647
    **SUMMARY**: WHEN I TOOK THE CAR INTO A DISCOUNT TIRE STORE TO HAVE NEW TIRES PUT ON THE BACK AT ABOUT 15,600 MILES ON THE CAR CRACKS WERE FOUND ON THE INSIDE RIM WHERE TIRE BEAD SEALS OF BOTH BACK WHEELS. PROBLEM WAS IMMEDIATELY REPORTED TO DEALER WHO VERIFIED CRACKS, BUT DEALER AND GM REFUSED TO REPLACE UNLESS I PURCHASE NEW WHEELS FOR DISCOUNTED PRICE OF $1,100.00 FOR REAR WHEELS ONLY. SPOKE WITH REPRESENTATIVES OF GM ENGINEERING AND FOUND PROBLEM IS A KNOWN ISSUE WITH REAR WHEEL CRACKING GOING BACK SEVERAL YEARS WITH CAST CHINA MADE WHEELS ON CORVETTE Z06 AND ZR1 MODELS. I WAS TOLD GM CORVETTE CHIEF ENGINEER HAS POSTED INFORMATION ON THE WHEEL CRACKING PROBLEM ON CORVETTE FORUM AND ONLY WAY TO NOT HAVE WHEEL CRACKING PROBLEM ON REPLACEMENT WHEELS WOULD BE TO NOT DRIVE ON ROADS WITH BUMPS OR POT HOLES. THEY AGREED THIS WAS NOT REALISTIC BUT GM STANDS FIRM ON PAYMENT FOR NEW WHEELS WITH NO ASSURANCE THIS WILL SOLVE THE PROBLEM. MY

COMPLAINT WAS CLOSED AT GM AS CUSTOMER DECLINED REDUCED PRICE OFFER AND IS DISSATISFIED. CRACKING WHEELS SHOULD BE A MAJOR SAFETY CONCERN AND ESPECIALLY WITH CARS THAT HAVE THIS MUCH POWER TO THE WHEELS AND ARE CAPABLE OF THE SPEEDS THESE MODEL CARS CAN OBTAIN. THIS IS TOTALLY IRRESPONSIBLE OF GM TO ALLOW THIS TO HAPPEN AND NOT RECALL THE WHEELS AND REPLACE THEM WITH ONES THAT DO NOT CRACK, ESPECIALLY ON CARS WITH SUCH LOW MILEAGE.

l. **DATE OF INCIDENT**: September 25, 2018
DATE COMPLAINT FILED: December 17, 2018
NHTSA/ODI ID: 11161931
**SUMMARY**: NOTICED A VIBRATION IN THE CAR AT HIGHWAY SPEEDS. TOOK THE VEHICLE INTO THE DEALER AND WAS TOLD THAT THE WHEEL WAS BENT. SERVICE MANAGER STATED THAT THIS WAS HAPPENING TO MANY CORVETTES AND WAS DUE TO THE STIFFNESS OF THE TIRE AND THE WEAKNESS OF THE FACTORY WHEEL. GM HAS DENIED A CLAIM UNDER WARRANTY.

m. **DATE OF INCIDENT**: October 17, 2018
DATE COMPLAINT FILED: December 13, 2018
NHTSA/ODI ID: 11161140
**SUMMARY**: FOUR REAR WHEELS HAVE CRACKED LEAKING AIR AND HAVE NO EXTERNAL DAMAGE FROM ROAD HAZARDS. TWO WERE REPLACED UNDER THE NEW CAR WARRANTY AND TWO WERE REPLACED UNDER GM'S PURCHASED EXTENDED WARRANTY. THE FIRST ONE, RIGHT REAR, CRACKED ON 11/19/16 WITH 18,843 MILES ON THE CAR. THE SECOND ONE,LEFT REAR, CRACKED ON 8/23/17 WITH 24,332 MILES ON THE CAR. THE THIRD ONE,LEFT REAR, CRACKED ON 8/14/18 WITH 34,854 MILES ON THE CAR. THE FOURTH ONE, RIGHT REAR, CRACKED ON 10/17/18 WITH 39,501 MILES ON THE CAR. CALLING THE GM HOT LINE I WAS TOLD TO CONTACT MY GM SERVICE DEPARTMENT IN REGARDS TO THIS ISSUE. THEY TOLD ME THE WHEEL WAS DESIGNED TO CRACK TO PROTECT THE REAR SUSPENSION !!! THIS IS A HUGE SAFETY ISSUE. WHAT WOULD HAPPEN IF THAT CRACK LEAD TO A WHEEL FAILURE AT SPEED? I HAVE

ALL MY GM SERVICE STATEMENTS TO BACK THESE
FACTS UP. GM NEEDS TO CORRECT THE PROBLEM!

n. **DATE OF INCIDENT**: October 31, 2018
DATE COMPLAINT FILED: January 5, 2019
NHTSA/ODI ID: 10954629
o.**SUMMARY**: CRACKED WHEEL AFTER DRIVING
OVER SMALL POTHOLE ON THE INTERSTATE
CAUSING CRACK IN RIM AND SLOW LOSS OF TIRE AIR
PRESSURE. CRACK IN REAR WHEEL INBOARD
FLANGE, WHEEL WAS NOT BENT OR WARPED.

p. **DATE OF INCIDENT**: November 1, 2018
DATE COMPLAINT FILED: November 14, 2018
NHTSA/ODI ID: 11151459
**SUMMARY**: TL* THE CONTACT OWNS A 2016
CHEVROLET CORVETTE. THE CONTACT STATED THAT
THERE WAS A FAILURE CONCERNING THE REAR OEM
FACTORY RIMS. THE CONTACT STATED THAT THE
METAL WAS NOT STRUCTURALLY SOUND AND THERE
WERE CRACKS IN THE REAR PASSENGER SIDE WHEEL.
THE FAILURE LED TO LOW TIRE PRESSURE. THE
DEALER (GEORGE MATICK CHEVROLET, 14001
TELEGRAPH RD, REDFORD CHARTER TWP, MI 48239,
(313) 531-7100) REPLACED THE OEM FACTORY RIM.
THE DEALER ALSO MENTIONED THAT THEY
RECEIVED SEVERAL COMPLAINTS FOR THE SAME
MODEL, BUT VARIOUS YEARS, CONCERNING THE OEM
REAR RIMS CRACKING AND THE LOW TIRE PRESSURE.
THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE. THE FAILURE MILEAGE WAS NOT
AVAILABLE. *TT *TR

q. **DATE OF INCIDENT**: November 1, 2018
DATE COMPLAINT FILED: November 2, 2018
NHTSA/ODI ID: 11145000
**SUMMARY**: 2017-2019 CORVETTE GRAND SPORT HAS
A HIGH NUMBER OF REPORT INSTANCES OF RIMS
CRACKING AND BENDING THAT FORUM MEMBERS
FEEL IS NOT NORMAL, NOT DUE TO HITTING
POTHOLES OR ANYTHING. I HAD NEVER HIT ANY
POTHOLES OR ANYTHING HARD, AND WHILE HAVING
MY TIRES CHANGED, THE SHOP SHOWS ME A CRACK
IN THE RIM. ON THE BLOG SITE "CORVETTE FORUM",
THERE'S NUMEROUS PEOPLE AND PICTURES OF

PEOPLE SHOWING THEIR CRACKED OR BENT RIMS. GM IS TELLING PEOPLE THIS IS NORMAL WEAR AND TEAR AND NOT DEALING WITH IT. THIS IS NOT NORMAL. SEVERAL PEOPLE HAVE REPORTED MULTIPLE TIRES BENT OR CRACKED. PLEASE INVESTIGATE. I'M SURE GM DOES NOT HAVE ACCURATE DATA, PEOPLE MOST PEOPLE REPORT THE DEALER TURNS THEIR CLAIM AWAY AS NOT BEING COVERED, SO IT'S NOT GETTING FULLY REPORTED. THIS APPEARS TO BE A PROBLEM ONLY WITH THE GRAND SPORT MODEL.

r.  **DATE OF INCIDENT**: December 20, 2018
DATE COMPLAINT FILED: December 21, 2018
NHTSA/ODI ID: 11163031
**SUMMARY**: I HAD A SLOW LEAK IN A REAR TIRE ON A Z06 WHEEL. THE TIRE SHOP FIXED THE LEAK AND INFORMED ME THE WHEEL WAS BENT. THE CAR WAS BOUGHT NEW AND HAS ONLY 2000 MILES ON THE ODO. I CANNOT RECALL HITTING A LARGE POTHOLE OR RUNNING OVER ANYTHING

s.  **DATE OF INCIDENT**: January 2, 2019
DATE COMPLAINT FILED: February 13, 2019
NHTSA/ODI ID: 11179916
**SUMMARY**: WE HAVE HAD TO REPAIR THEN REPLACE 2 REAR CRACKED RIMS IN THE 1.5 YEARS WE HAVE OWNED THIS VEHICLE. THE FIRST ONE WAS 3 MONTHS AFTER PURCHASING IT AND THE SECOND ONE WAS IN JANUARY 2019. AFTER NOTICING BOTH TIMES THAT FIRST THE LEFT TIRE WAS LOSING AIR A HAIRLINE CRACK WAS NOTICED ON THE INSIDE OF THE RIM. WE HAD IT REPAIRED AND IT DID NOT LAST SO FOR SAFETY REASONS WE NEEDED TO REPLACE IT. THE SAME THING HAPPENED WITH THE RIGHT SIDE IN LATE 2018. IT WAS AGAIN SUGGESTED WE REPAIR IT, THEN AGAIN THE REPAIR DID NOT HOLD AND WE NEEDED TO REPLACE.

t.  **DATE OF INCIDENT**: January 14, 2019
DATE COMPLAINT FILED: January 29, 2019
NHTSA/ODI ID: 11172809
**SUMMARY**: 2 BENT WHEELS UNDER (BETTER THAN) NORMAL DRIVING CONDITIONS ON MY 2017 CORVETTE GRAND SPORT. GARAGE KEPT/COVERED.

PRISTINE 2-YEAR-OLD CAR WITH 7000 MILES. SERVICE DEPT ALERTED ME TO THE BENDS DURING SCHEDULED MAINTENANCE AND WHILE INVESTIGATING A PULSING PROBLEM IN THE FRONT BRAKE ROTORS.

THE VEHICLE IS HARDLY EVER DRIVEN, HAS NEVER SEEN ROUGH ROADS/CITY STREETS/BAD WEATHER/ETC. THE VEHICLE HAS NEVER BEEN "TRACKED" OR OTHERWISE ABUSED. THIS IS A "SUMMER ONLY," WEEKEND VEHICLE THAT HAS BEEN IMPECCABLY MAINTAINED.

THERE ARE NO VISIBLE SCUFFS/SCRAPES/BENDS/BULGES OR OTHER DAMAGE TO THE TIRES OR WHEELS. NEVER HIT ANY POTHOLE/ROAD HAZARD/DEBRIS, *EVER.*

BASED ON RECENT ONLINE RESEARCH AND INFORMATION FROM THE SERVICE MANAGER, I'M NOW CONCERNED THAT THESE WHEELS WILL TOTALLY CRACK OR OTHERWISE DEFORM WHILE DRIVING. THIS IS AN ACCIDENT WAITING TO HAPPEN.

AFTER OPENING A CASE (9-5012193448) AND OVER AN HOUR ON THE PHONE, GM HAS DENIED A WARRANTY CLAIM AND WILL NOT FURTHER DISCUSS/ESCALATE THIS ISSUE. GM WOULD NOT PROVIDE A DESCRIPTION OR COPY OF THE METHOD USED TO DETERMINE "DEFECT VS.DAMAGE", OR A WRITTEN COPY OF THE EVALUATION MADE BY THE REGIONAL WARRANTY REP.

GM REFUSES TO DISCLOSE ANY INFORMATION REGARDING OTHER INSTANCES OF THIS PROBLEM, WILL NOT REPLACE/REPAIR THE DEFECTIVE WHEELS, AND WILL NOT PAY FOR A SUITABLE/COMPARABLE 3RD PARTY REPLACEMENT.

I'VE ALSO READ ABOUT OTHER OWNERS HAVE THE SAME ISSUES VIA THESE LINKS:

HTTPS://WWW.CARANDDRIVER.COM/REVIEWS/A2370 5281/2017-CHEVROLET-CORVETTE-GRAND-SPORT-RELIABILITY/

HTTPS://WWW.CORVETTEFORUM.COM/FORUMS/C7-
GENERAL-DISCUSSION/4161059-2018-GRAND-SPORT-
CRACKED-RIM.HTML

HTTP://WWW.CARPROBLEMZOO.COM/CHEVROLET/CO
RVETTE/WHEEL-PROBLEMS.PHP

u.  **DATE OF INCIDENT**: January 19, 2019
DATE COMPLAINT FILED: January 21, 2019
NHTSA/ODI ID: 11171195
**SUMMARY**: THE WHEELS ON MY VEHICLE ARE
CRACKED ON THE REAR PASSENGER SIDE. I PICKED
UP MY (NEW) CAR FROM LAMARQUE AUTO DEALER
IN NEW ORLEANS AND DROVE HOME TO BEAUMONT.
WHEN I GOT TO BEAUMONT, THE LOW TIRE PRESSURE
WARNING CAME ON. SO TODAY (1-21-19) I TOOK CAR
TO DISCOUNT TIRE AND THEY FOUND THAT MY
WHEEL IS CRACKED. I' ASSUMING IT CRACKED WHILE
DRIVING OVER 200 MILES ON I-10 HEADED HOME.

v.  **DATE OF INCIDENT**: January 27, 2019
DATE COMPLAINT FILED: February 20, 2019
NHTSA/ODI ID: 11181387
**SUMMARY**:    2017    CORVETTE    GRAND    SPORT,
PURCHASED   IN   JUNE   OF   2017,   ONLY   USED   ON
WEEKEND AND THE CURRENT MILEAGE IS ONLY 930.

JUST NOTICED A VIBRATION IN THE FRONT END
WHEN TRAVEL ON HIGHWAY AT SPEED 55+.

BRING THE CAR TO THE DEALERSHIP FOR INSPECTION
AND  THE  SERVICE  MANAGER  INFORM  ME  ALL  4
WHEELS HAS BEEN BEND AND NEED TO BE REPLACE.

w. FILE A CASE (9-5019078980) WITH GM CUSTOMER
CARE  CENTER  AND  AFTER  1  WEEK,  GM  CENTER
CALLED AND TOLD ME THIS IS NOT COVER UNDER
THE FACTORY WARRANTY. VERY DISAPPOINT AND
LOOSING  TRUST  IN  GM  PRODUCT  RELATED  TO
QUALITY, RELIABILITY AND SAFETY CONCERN FOR
THE CONSUMERS.

THIS PROBLEM WITH THE FACTORY WHEEL BENDING
OR  CRACKING  HAS  BEEN  REPORT  AND  LISTED  IN

SEVERAL CORVETTE FORUM AND MOST ARE RELATED TO THE 2017-2019 GRAND SPORT MODEL.

HOPEFULLY THERE WILL BE AN INVESTIGATION OPEN SOON TO PREVENT ANY FURTHER DAMAGE CAUSING SERIOUS ACCIDENT SIMILAR TO THE AIR BAG PROBLEMS.

x.**DATE OF INCIDENT**: February 22, 2019
DATE COMPLAINT FILED: March 1, 2019
NHTSA/ODI ID: 11183573
**SUMMARY**: ON OR ABOUT SEPTEMBER 11, 2018 I NOTICED MY RIGHT FRONT TIRE WAS LOW ON AIR. I TOOK IT TO LES SCHWAB TIRE AND THEY REPAIRED A LEAK FROM A SCREW. A COUPLE OF DAYS LATER I NOTICED THE TIRE WAS STILL GOING LOW I TOOK IT BACK AND THEY INFORMED ME THAT IT HAD A CRACKED WHEEL. I PURCHASED A NEW WHEEL FROM CHEVROLET AND HAD LESS SCHWAB INSTALL IT FOR ME . I JUST RECENTLY 2/22/2019 PUT NEW TIRES ON THE CAR AND THE DEALERSHIP NOTED THE BRAND NEW WHEEL I PUT ON THE RIGHT REAR HAS CRACKS IN IT NOW AS WELL AS THE LEFT REAR WHEEL WHICH IS LOSING AIR. THESE WHEELS ARE EXPENSIVE I BELIEVE THEY RETAIL FOR $800 EACH AT THE DEALER AND ARE DEFECTIVE AND DANGEROUS. MOST OF OUR MILES ARE HIGHWAY MILES DRIVING BETWEEN SAN JOSE CALIFORNIA AND ELK GROVE CALIFORNIA BETWEEN MY OFFICES.

y.  **DATE OF INCIDENT**: March 1, 2019
DATE COMPLAINT FILED: March 2, 2019
NHTSA/ODI ID: 11183598
**SUMMARY**: FACTORY WHEELS CRACKED FROM NORMAL DRIVING ON THE INNER LIP, TIRE MECHANIC ADVISED HE'S SEEN MANY OF THESE ON THE Z06 WHEELS AND IT'S A KNOWN PROBLEM HOWEVER GM WON'T COVER THE DEFECTIVE WHEELS UNDER WARRANTY. THE CRACKED WHEEL CAUSES A SLOW LEAK END EVENTUALLY CAN BREAK IF GONE UNDETECTED RESULTING IN A LOSS OF CONTROL OF THE VEHICLE.

z.  **DATE OF INCIDENT**: March 18, 2019
DATE COMPLAINT FILED: April 10, 2019

NHTSA/ODI ID: 11195307

**SUMMARY**: CORVETTE REAR WHEEL WAS LOSING AIR SO INSPECTED TIRES AND FOUND NO HOLES. WENT TO CORVETTE FORUM TO LEARN THIS IS A KNOWN PROBLEM ON Z06 AND GRAND SPORTS. SEEMS GM HAS A PROBLEM WITH CRACKING. MY CRACK IS EXACTLY WHAT THE FORUM MEMBERS HAVE. HAIRLINE CRACK IN THE RIM ON THE NON-HUB SIDE. THIS IS A SAFETY ISSUE AS THE RIM COULD COME APART AT SPEED AND CAUSE A SERIOUS ACCIDENT. I HAVE NO OTHER DAMAGE TO THE WHEEL AND HAVE NOT HAD ANY CURB DAMAGE. I BABY THIS CAR AND THE SAME CRACK THAT MANY OTHERS HAVE EXPERIENCED APPEAR.

## Customer Complaints on Third-Party Websites

179. Consumers similarly complained about the defect on various online forums. Below are some examples.

    a.    **August 31, 2017:** There have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend on a brand new Grand Sport. In my situation, there was absolutely no damage, scratch or even a mark anywhere - the wheel just went out of round with less than 1000 miles on the car.

        Why is this happening, is Chevy aware of this happening on more than an isolated occurrence, and what is being done to remedy the situation? Will you improve the strength of these Chinese-made wheels and offer a recall/replacement? (*Available at* https://www.corvetteforum.com/forums/ask-tadge/4036656-asked-grand-sport-z06-wheels-bending.html)

    b.    **September 13, 2017:** I have 3 bent and one broken wheel and have never hit anything hard enough to do this kind of damage. Dealer did not diagnose the problem however did tell me to stop driving in sport mode. (*Id.*)

c.   **September 20, 2017:** In for a response. We have had a few customers and a trade-in (all C7 Z's) with 3 or 4 bent wheels per car. Thankfully we have sourced a company that will repair the wheels, much cheaper than replacing. This is clearly a defect if this is as common as it seems. (*Id.*)

d.   **October 20, 2017:** I have several [bent] rims, probably seven, I'll have to count all of them. They are all in the rear and none of them were from hitting anything that is worse than any other expansion joint or imperfection in the road. I'm very careful not to hit potholes. The roads I travel on are actually in very good shape. (*available at* https://www.corvetteforum.com/forums/c7-general-discussion/4056471-have-you-had-a-wheel-bend.html#post1595799836)

e.   **October 20, 2017:** Five bent wheels within the first 2,700 miles. Currently have 6,700 miles on my C7Z. All were bent on public streets. The first four were all bent at the same time from a pothole that was kind of hidden in the shadows and I tried to straddle at about 35 mph, it didn't work. The fifth was a very minor bump coming off a freeway bridge at 55 mph. Couldn't feel any vibration until 45+ mph with any of these. (*Id.*)

f.   **October 22, 2017:** Fast forward several months, I return to the same dealership regarding the vibration issue which had gotten progressively worse. At that time, the dealership informed me that all four rims were bent. I've since heard that driving in Sport mode could result in bent wheels. Available at (*Id.*)

g.   **May 8, 2018:** Yes...I have just been informed by my dealer that My C7 Z06 has two bent wheels.

They caused the car to have a rythmic vibration. Only 3000 miles and no evidence of damage and I have no recollection of any road hazards hit. I noticed the vibration right after taking a very hard off ramp ! (*Id.*)

h.   **June 20, 2018:** 2 front wheels bent on a 2017 GS. (*Id.*)

i.   **June 20, 2018:** I took my 2017 GS in today for a vibration. They say all four wheels are bent! (*Id.*)

j.   **June 24, 2018:** I had a shimmy in the steering wheel on my 2017 GS. It seems I had 3 bent wheels and a cracked wheel. Insurance company purchased through the dealer is being a real pain. They want to give me a $650 wheel for the one that was cracked even though the GM price is over $900 for the Chrome clad. The other 3 have been straightened and are perfect. Now to fight for a GM wheel and an alignment…. (*Id.*)

k.   **June 27, 2018:** The verdict is in, they tell me that 3 of the wheels are BENT?!? I haven't even hit as much as a pothole and 3 of the 4 wheels are bent?!?! WTF?!?!

The LR wheel and both Right (Front and Rear) are bent according to the dealer. They said that one of the right ones, I'm so pissed I don't even remember which one they told me, was so bent that you didn't have to spin it to see it. And OF COURSE they are not covered under warranty. (*Id.*)

l.   **June 28, 2018:** 2018 GS had all 4 wheels bent and a cracked one also, I believe from potholes at highway speeds. Drove it from Maryland to Colorado. Put new Z06 style wheels on and waiting for an answer from the T&W insurance. Couldn't wait for them to make a decision and not drive my car. Now it rides fantastic. (*Id.*)

m.   **October 11, 2018:** I have a 2017 GrandSport Corvette, 10K miles. Purchased 10/20/17. I have bent a total of 6 rims. First 2 rims were bent in May. All 4 rims were bent in June.

My insurance replaced the first 2 bent rims with new ones. I hit a small pothole on the highway. I was shock that the rims bent so easy. The next month I bent all 4 rims, paid $700 to get the 4 bent rims straighten, trying to save money. The 4 rims later kept re-bending so I lost my money. I ended up just purchasing forged rims from Cray. I have owned 3 corvettes; I have never bent rims until I purchased this car. Corvette should be ashamed of themselves putting cheap rims on a car

that cost this much money. All the C7 (GS, Z06) owners should get together to file a case action suit against them. That is the only way to get someone to listen. (*Id.*)

n. **November 16, 2018:** Three bent GS wheels. Don't use Sport mag ride setting anymore. One wheel straightened and bent again. Dealer (Penske) wouldn't cover it. Replacement wheel from Midwest $ 485 + shipping each. These wheels are noodles! (*Id.*)

o. **November 16, 2018:** My 4 bent rims had no tire damage, all rims were bent on inside bead, no rim damage other than being egg shaped, no tire or rim damage tells me the rims are not up to what roads in the USA are like. (*Id.*)

p. **November 16, 2018:** Bought my 2016 Z with 30K miles and a cracked rear wheel was found at inspection. (*Id.*)

q. **November 26, 2018:** Left Rear, Right Front, and Right Rear, on a Grand Sport Collector Edition. (*Id.*)

180. GM had superior and exclusive knowledge of the Wheel Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

181. Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased their respective Class Vehicles, and since 2015, GM knew about the Wheel Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from GM dealers about the problem.

182. GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including pre-sale durability testing, on incoming components, including the wheels, to verify the parts are free from defect and align with GM's specifications.[5] Thus, GM knew or should have known that the subject wheels were defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

183. Additionally, GM should have learned of this widespread defect from the sheer number of reports received from dealerships and from customer complaints directly to GM. GM's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

184. Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to GM,

---

[5] See Exhibit 4, Akweli Parker, How Car Testing Works, HowStuffWorks.com, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.html ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed September 8, 2020).

because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

185. The existence of the Wheel Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Wheel Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

186. On information and belief, the Wheel Defect has been so prevalent that the Wheels at issue have been subject to multiple months-long back orders for replacements, as was experienced by Plaintiff Williams.

187. Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's wheels are safe, will function in a manner that will not pose a safety risk, and are free of defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Wheel Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to fail to disclose the Wheel Defect to them and to continually deny it.

### D.    GM Has Actively Concealed the Wheel Defect

188. Despite its knowledge of the Wheel Defect in the Class Vehicles, GM actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, GM failed to disclose or actively concealed at and after the

time of purchase, lease, or repair:

> a) any and all known material defects or material nonconformity of the
> Class Vehicles, including the defects pertaining to the wheels;
>
> b) that the Class Vehicles, including the wheels, were not in good in
> working order, were defective, and were not fit for their intended
> purposes; and
>
> c) that the Class Vehicles and the wheels were defective, despite the
> fact that GM learned of such defects as early as 2015.

189. As discussed above, GM monitors its customers' discussions on online forums such as www.corvetteforum.com, and actively concealed the defect by denying the existence of a defect and blaming the class members for the problems.

190. When consumers present their Class Vehicles to an authorized GM dealer for rim repairs or replacements, GM refuses to honor the 3-year, 36,000-mile warranty, telling the customers that the rim failures are the customers' fault.

191. Accordingly, despite GM's knowledge of the Wheel Defect, GM has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' rims.

## V.   TOLLING AND ESTOPPEL

### A.   Discovery Rule Tolling

192. Class members had no way of knowing what GM knew about the Wheel

Defect in their Class Vehicles. As evidenced by its refusal to acknowledge the defect and honor its warranty, while representing and leading consumers to believe that any damages to their wheels were the result of the consumers' actions, GM was intent on expressly hiding the defect and its behavior from the public. This is the quintessential case for tolling.

193. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that GM was concealing the defect complained of herein and misrepresenting the company's true position with respect to the quality and safety of its vehicles. Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that GM was concealing the Wheel Defect.

194. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all Class Vehicles identified herein.

## B.    Estoppel

195. GM was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the defective wheels in the vehicles at issue.

196. GM knowingly, affirmatively, and actively concealed the true nature,

quality, and character of the defective wheels in the Class Vehicles.

197. Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

## VI. CLASS ACTION ALLEGATIONS

198. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

199. The Classes are defined as:

**Nationwide Class:**
All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Subclass:**
All individuals who purchased or leased any 2015 to 2019 model year Chevrolet Corvette Z06 or 2017 to 2019 model year Chevrolet Corvette Grand Sport vehicle in the State of California.

**CLRA Subclass:**
 All members of the California Subclass who are "consumers" within the meaning of California Civil Code § 1761(d).

**Florida Subclass:**
All members of the Nationwide Class who are residents of Florida or who purchased or leased their Class Vehicle in the State of Florida.

**Illinois Subclass:**
All members of the Nationwide Class who are residents of Illinois or who purchased or leased their Class Vehicle in the State of Illinois.

**Massachusetts Subclass:**
All members of the Nationwide Class who are residents of Massachusetts or who purchased or leased their Class Vehicle in the Commonwealth of Massachusetts.

**Michigan Subclass:**
All members of the Nationwide Class who are residents of Michigan or who purchased or leased their Class Vehicle in the State of Michigan.

**New Hampshire Subclass:**
All members of the Nationwide Class who are residents of New Hampshire or who purchased or leased their Class Vehicle in the State of New Hampshire.

**New Jersey Subclass:**
All members of the Nationwide Class who are residents of New Jersey or who purchased or leased their Class Vehicle in the State of New Jersey.

**New York Subclass:**
All members of the Nationwide Class who are residents of New York or who purchased or leased their Class Vehicle in the State of New York.

**Pennsylvania Subclass:**
All members of the Nationwide Class who are residents of Pennsylvania or who purchased or leased their Class Vehicle in the Commonwealth of Pennsylvania.

**Ohio Subclass:**
All members of the Nationwide Class who are residents of Ohio or who purchased or leased their Class Vehicle in the State of Ohio.

**South Carolina Subclass:**
All members of the Nationwide Class who are residents of South Carolina or who purchased or leased their Class Vehicle in the State of South Carolina.

**Texas Subclass:**
All members of the Nationwide Class who are residents of Texas or who purchased or leased their Class Vehicle in the State of Texas.

200. Excluded from the Class are: (1) Defendant, any entity or division in

which Defendant has a controlling interest, and their legal representatives, officers,

directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

201. Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

202. Typicality: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective wheels. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

203. Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

a) Whether Class Vehicles suffer from defects relating to the wheels;

b) Whether the defects relating to the wheels constitute an unreasonable safety risk;

c) Whether Defendant knows about the defects pertaining to the wheels and, if so, how long Defendant has known of the defect;

d) Whether the defective nature of the wheels constitutes a material fact;

e) Whether Defendant has a duty to disclose the defective nature of the wheels to Plaintiffs and Class Members;

f) Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

g) Whether Defendant knew or reasonably should have known of the defects pertaining to the wheels before it sold and leased Class Vehicles to Class Members;

h) Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles

and for the costs and expenses of repairing and replacing the defective wheels;

i)  Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective wheels;

j)  Whether Defendant breached the implied warranty of merchantability; and

k)  Whether Defendant breached written warranties.

204. Adequate Representation: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

205. Predominance and Superiority: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action,

Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## VII.   VIOLATIONS ALLEGED

### A.   Claims Brought on Behalf of the Nationwide Class

<u>COUNT I</u>

**Breach of Written Warranty Pursuant to the Magnuson-Moss Warranty Act (15 U.S.C. § 2303 *et seq.*)**

206. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

207. Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

208. The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

209. Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

210. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

211. Defendant's express warranty is a "written warranty" within the meaning

67

of 15 U.S.C. § 2301(6).

212. As set forth supra and incorporated by reference, Defendant extended a 36-month, 36,000-mile Bumper-to-Bumper warranty.

213. Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

214. Defendant's breach of the express warranties has deprived the Plaintiffs and Class members of the benefit of their bargain.

215. Defendant's breach of express warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

216. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

217. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses

and repair of the wheels.

218. As a direct and proximate cause of Defendant's breach of written warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

## COUNT II

### Breach of Implied Warranty Pursuant to the Magnuson-Moss Warranty Act (15 U.S.C. § 2303 *et seq*.)

219. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

220. Plaintiffs brings this cause of action on behalf of themselves and the Class against Defendant.

221. The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

222. Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

223. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

224. GM impliedly warranted that the Class Vehicles were of merchantable

quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels were manufactured, supplied, distributed, and/or sold by GM would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use while the Class Vehicles were being operated.

225. Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design of their wheels.

226. Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

227. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

228. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the wheels.

229. As a direct and proximate cause of Defendant's breach of implied

warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

230. Because of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## COUNT III

### Unjust Enrichment

231. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

232. Plaintiffs bring this cause of action individually and on behalf of the Class.

233. As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

234. Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred

an unjust substantial benefit upon Defendant.

235. Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

236. As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

**B.     Claims Brought on Behalf of the California Subclass**

<u>**COUNT IV**</u>

**Violation of California's Consumers Legal Remedies Act,**
**(Cal. Civ. Code § 1750, *et seq*.)**

237. Plaintiffs Barrington and Holguin incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

238. Plaintiffs Barrington and Holguin bring these causes of action individually and on behalf of the CLRA Subclass.

239. Defendant is a "person" as defined by California Civil Code § 1761(c).

240. Plaintiffs and CLRA Subclass Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

241. By failing to disclose and concealing the defective nature of the wheels from Plaintiff and prospective Class Members, Defendant violated California Civil

Code § 1770(a), as it represented that the Class Vehicles and their wheels had characteristics and benefits that they do not have and represented that the Class Vehicles and their wheels were of a particular standard, quality, or grade when they were of another. See Cal. Civ. Code §§ 1770(a)(5) & (7).

242. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

243. Defendant knew that the Class Vehicles and their wheels suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

244. Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

245. Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the wheels and/or the associated repair costs because:

a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' wheels;

73

b) Plaintiff and Class Members could not reasonably have been expected to learn or discover that their wheels had a dangerous safety defect until it manifested; and

c) Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn of or discover the safety defect.

246. In failing to disclose the defective nature of wheels, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

247. The facts Defendant concealed from or failed to disclose to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Plaintiffs and Class Members known that the Class Vehicles' wheels were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

248. Plaintiffs Barrington and Holguin and Class Members are reasonable consumers who do not expect the wheels installed in their vehicles to exhibit problems such as the Wheel Defect. This is the reasonable and objective consumer expectation relating to a vehicle's wheels.

249. Because of Defendant's conduct, Plaintiffs Barrington and Holguin and

Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Wheel Defect.

250. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs Barrington and Holguin and Class Members suffered and will continue to suffer actual damages.

251. Plaintiffs Barrington and Holguin and the Class are entitled to equitable relief.

252. Plaintiffs Barrington and Holguin provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant failed to provide appropriate relief for its violations of the CLRA within 30 days. Accordingly, Plaintiffs seek monetary, compensatory, and punitive damages, in addition to equitable and injunctive relief.

## <u>COUNT V</u>

**Violation of California Business & Professions Code § 17200, *et seq*.**

253. Plaintiffs Barrington and Holguin incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

254. Plaintiffs Barrington and Holguin bring these causes of action individually and on behalf of the California Subclass.

255. Because of their reliance on Defendant's omissions, owners and/or

lessees of the Class Vehicles, including Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

256. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

257. Plaintiffs Barrington and Holguin and Class Members are reasonable consumers who do not expect their wheels to warp and crack.

258. Defendant knew the Class Vehicles and their wheels were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

259. In failing to disclose the Wheel Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

260. Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles and their wheels because:

    a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' wheels; and

    b) Defendant actively concealed the defective nature of the Class

Vehicles and their wheels from Plaintiff and the Class.

261. The facts Defendant concealed from or failed to disclose to Plaintiffs and Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had they known of the Wheel Defect, Plaintiffs and the other Class Members would have paid less for Class Vehicles equipped with the subject wheels or would not have purchased or leased them at all.

262. Defendant continued to conceal the defective nature of the Class Vehicles and their wheels even after Class Members began to report problems.

263. Defendant's conduct was and is likely to deceive consumers.

264. Defendant's acts, conduct, and practices were unlawful, in that they constituted:

    a) Violations of California's Consumers Legal Remedies Act;

    b) Violations of the Song-Beverly Consumer Warranty Act;

    c) Violations of the Magnuson-Moss Warranty Act; and

    d) Breach of Express Warranty under California Commercial Code section 2313.

265. By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

266. Defendant's unfair or deceptive acts or practices occurred repeatedly in

Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

267. As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiffs Barrington and Holguin and Class Members have suffered and will continue to suffer actual damages.

268. Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**COUNT VI**

**Breach of Implied Warranty Pursuant to Song-Beverly
Consumer Warranty Act
(Cal. Civ. Code §§ 1792 and 1791.1, *et seq.*)**

269. Plaintiffs Barrington and Holguin incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

270. Plaintiffs Barrington and Holguin bring these causes of action against Defendant individually and on behalf of the California Subclass.

271. Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

272. Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable

and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

273. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

274. Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective wheels.

275. The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

276. Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

277. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## COUNT VII

### Breach of Express Warranty
### (Cal. Com. Code §§ 2313, 10210)

278. Plaintiffs Barrington and Holguin incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

279. Plaintiffs Barrington and Holguin bring these causes of action on behalf of himself and on behalf of the California Subclass against Defendant.

280. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

281. The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

282. In a section entitled "What is Covered," Defendant's express warranty

provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

283. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

284. Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

285. Plaintiffs were not required to notify GM of the breach or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels, and from other internal sources.

286. As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

287. Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### C.  Claims Brought on Behalf of the Florida Subclass

### <u>COUNT VIII</u>

### Violation of Florida's Unfair & Deceptive Trade Practices Act
#### (FLA. STAT. § 501.201, *et seq.*)

288. Plaintiff Rochford incorporates by reference all preceding allegations as though fully set forth herein.

289. Plaintiff Rochford brings this Count individually and on behalf of the Florida Subclass.

290. Plaintiff Rochford and Class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

291. GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

292. The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

293. In the course of its business, GM willfully failed to disclose and/or actively concealed the fact that the Class Vehicles have defective wheels discussed herein and the fact that GM would not cover repair or replacement of the defective wheels under its warranty, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

294. GM was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.

295. By failing to disclose that the Class Vehicles have defective wheels and were not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its warranty and vehicles after they were sold, GM engaged in deceptive business

practices in violation of the FUDTPA.

296. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Rochford and the other Class members, about the true performance of the Class Vehicles, the quality of the GM brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

297. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff Rochford and the Florida Subclass.

298. GM knew or should have known that its conduct violated the FUDTPA.

299. GM owed Plaintiff Rochford a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because GM had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective wheels and its warranty coverage.

300. The existence of the Defect, the defective wheels, and the true performance of the Class Vehicles were material facts to Plaintiff Rochford and the Florida Subclass.

301. GM's violations present a continuing risk to Plaintiff Rochford and the Florida Subclass members, as well as to the general public. GM's unlawful acts and

practices complained of herein affect the public interest.

302. GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of the Class Vehicles suffered ascertainable loss from not obtaining the benefit of their bargains.

303. As a direct and proximate result of GM's violations of the FUDTPA, Plaintiff Rochford and the Florida Subclass have suffered injury-in-fact and/or actual damage in paying to replace and/or repair the defective wheels and in paying more to purchase or lease the Class Vehicles than they would have had they known of the Wheel Defect. Class members who purchased or leased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them but for GM's violations of the FUDTPA.

304. Plaintiff Rochford and the Florida Subclass are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

305. Plaintiff Rochford and the Florida Subclass members also seek an order enjoining GM's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT IX

### Breach of Express Warranty
### (FLA. STAT. § 672.313)

306. Plaintiff Rochford incorporates by reference all preceding allegations as

though fully set forth herein.

307. Plaintiff Rochford brings this Count individually and on behalf of the Florida Subclass.

308. GM is and was at all relevant times a merchant with respect to motor vehicles.

309. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

310. As a manufacturer of motor vehicles, GM was required to provide these warranties to purchasers of the Class Vehicles.

311. GM's warranties formed the basis of the bargain that was reached when Plaintiff Rochford and other Class members purchased or leased their Class Vehicles equipped with the defective wheels.

312. Plaintiff Rochford and the Class members experienced defects within the warranty period.

313. GM breached the express warranty promising to repair and correct or replace a manufacturing defect or defect in materials or workmanship of the Class Vehicles.

314. Affording GM a reasonable opportunity to cure its breach of written

warranties would be unnecessary and futile here because GM has repeatedly refused to honor its warranty.

315. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Rochford and Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

316. Accordingly, recovery by Plaintiff Rochford and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff Rochford, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

317. GM was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

318. As a direct and proximate result of GM's breach of express warranties, Plaintiff Rochford and the other Class members have been damaged in an amount to be determined at trial.

## COUNT X

### Breach of Implied Warranty
### (FLA. STAT. § 672.314)

319. Plaintiff Rochford incorporates by reference all preceding allegations as

though fully set forth herein.

320. Plaintiff Rochford brings this Count individually and on behalf of the Florida Subclass.

321. GM is and was at all relevant times a merchant with respect to motor vehicles.

322. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the defective wheels are not safe, merchantable or suitable for high performance sports cars.

323. GM was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

324. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff Rochford and the Florida Subclass members have been damaged In an amount to be proven at trial.

### D.     Claims Brought on Behalf of the Illinois Subclass

### COUNT XI

### Violations of Illinois Consumer Fraud and Deceptive Business Practices Act
(815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)

325. Plaintiff Mirenda incorporates by reference all preceding allegations as though fully set forth herein.

326. Plaintiff Mirenda brings this Count individually and on behalf of the Illinois Subclass.

327. Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

328. Plaintiff Mirenda and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

329. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

330. GM participated in misleading, false, or deceptive practices that violated the Illinois CFA.

331. In the course of its business, GM willfully failed to disclose and/or

actively concealed the fact that the Class Vehicles have defective wheels discussed herein and the fact that GM would not cover repair or replacement of the defective wheels under its warranty, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

332. GM was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.

333. By failing to disclose that the Class Vehicles have defective wheels and were not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its warranty and vehicles after they were sold, GM engaged in deceptive business practices in violation of the Illinois CFA.

334. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Mirenda and the other Class members, about the true performance of the Class Vehicles, the quality of the GM

brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

335. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff Mirenda and the Illinois Subclass.

336. GM knew or should have known that its conduct violated the Illinois CFA.

337. GM owed Plaintiff Mirenda a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because GM had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective wheels and its warranty coverage.

338. The existence of the Defect, the defective wheels, and the true performance of the Class Vehicles were material facts to Plaintiff Mirenda and the Illinois Subclass.

339. GM's violations present a continuing risk to Plaintiff Mirenda and the Illinois Subclass members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

340. GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the Illinois CFA. All owners of the Class Vehicles suffered

ascertainable loss from not obtaining the benefit of their bargains.

341. As a direct and proximate result of GM's violations of the Illinois CFA, Plaintiff Mirenda and the Illinois Subclass have suffered injury-in-fact and/or actual damage in paying to replace and/or repair defective wheels and in paying more to purchase or lease the Class Vehicles than they would have had they known of the Wheel Defect. Class members who purchased or leased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them but for GM's violations of the Illinois CFA.

342. Pursuant to 815 ILCS 505/10a(a), Plaintiff Mirenda and the Illinois Subclass seek monetary relief against GM in the amount of actual damages.

343. Plaintiff Mirenda also seeks an order enjoining GM's unfair and/or deceptive acts or practices, attorneys' fees, costs, and any other just and proper relief available under the 815 ILCS 505/1 et seq.

## COUNT XII

### Breach of Express Warranty
### (800 ILL COMP. STAT. 5/2-313)

344. Plaintiff Mirenda incorporates by reference all preceding allegations as though fully set forth herein.

345. Plaintiff Mirenda brings this Count individually and on behalf of the Illinois Subclass.

346. GM is and was at all relevant times a merchant with respect to motor

vehicles.

347. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

348. As a manufacturer of motor vehicles, GM was required to provide these warranties to purchasers of the Class Vehicles.

349. GM's warranties formed the basis of the bargain that was reached when Plaintiff Mirenda and other Class members purchased or leased their Class Vehicles equipped with the defective wheels.

350. Plaintiff Mirenda and the Class members experienced defects within the warranty period.

351. GM breached the express warranty promising to repair and correct or replace a manufacturing defect or defect in materials or workmanship of the Class Vehicles.

352. Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because GM has repeatedly refused to honor its warranty.

353. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiff Mirenda and Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

354. Accordingly, recovery by Plaintiff Mirenda and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff Mirenda, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

355. GM was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

356. As a direct and proximate result of GM's breach of express warranties, Plaintiff Mirenda and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XIII

### Breach of Implied Warranty of Merchantability
### (800 ILL COMP. STAT. 5/2-314 AND 5/2A-212)

357. Plaintiff Mirenda incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

358. Plaintiff Mirenda brings this Count individually and on behalf of the Illinois Subclass.

359. GM is and was at all relevant times a "merchant" with respect to motor

vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

360. With respect to leases, GM is and was at all relevant times a "lessor" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-103(1)(p).

361. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the defective wheels are not safe, merchantable or suitable for high performance sports cars.

362. GM was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

363. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff Mirenda and the Illinois Subclass members have been damaged in an amount to be proven at trial.

E.     **Claims Brought on Behalf of the Massachusetts Subclass**

## COUNT XIV

**Violation of Massachusetts's Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A, § 1, *et seq*.)**

364. Plaintiff Alfred Lupis incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

365. Plaintiff Lupis brings this Count individually and on behalf of the Massachusetts Subclass.

366. Mass. Gen. Laws Ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

367. At all relevant times, GM was engaged in commerce within the meaning of Mass. Gen. Laws, Ch. 93A.

368. As alleged more fully herein, GM has violated Mass. Gen. Laws, Ch. 93A in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the transmissions in Class Vehicles are defective and pose a safety hazard.

369. As a direct and proximate result of GM's conduct, Plaintiff Lupis and other members of the Class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, paid for wheel diagnoses, repairs, and replacements, towing, and/or

rental cars, and are left with Class Vehicles of diminished value and utility because of the defect. Meanwhile, GM unjustly enriched itself by selling more Class Vehicles than it otherwise could have and by charging inflated prices for those vehicles.

370. Pursuant to Mass. Gen. Laws Ch. 93A § 3, Plaintiff seeks damages and appropriate equitable relief, including an order requiring GM to adequately disclose and repair the Rim Defect and an order enjoining GM from incorporating the defective wheels into its vehicles in the future.

371. Plaintiff Lupis, on behalf of himself and Massachusetts Subclass members, made a demand for relief, in writing, to GM at least thirty (30) days prior to filing this amended Complaint, on August 21, 2017, as required by Mass. Gen. Laws Ch. 93A § 9. GM has declined Plaintiff's request.

372. Based on the foregoing, Plaintiff Lupis and the Class are entitled to all remedies available pursuant to Mass. Gen. Laws Ch. 93A, § 9, including refunds, actual damages, or statutory damages in the amount of 25 dollars per violation, whichever is greater, double or treble damages, attorney fees and other reasonable costs. Plaintiff and the Massachusetts Subclass also request that the Court award equitable relief, including an order requiring GM to adequately disclose and repair the Rim Defect and an order enjoining GM from incorporating the defective wheels into its vehicles in the future.

## COUNT XV

**Breach of Express Warranty**
**(Mass. G.L. c. 106 § 2-313)**

373. Plaintiff Alfred Lupis incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

374. Plaintiff Lupis brings this Count individually and on behalf of the Massachusetts Subclass.

375. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under Massachusetts law.

376. The Wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

377. In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

378. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is

for the first 3 years or 36,000 miles, whichever comes first."

379. Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, if and when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiff's and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

380. Plaintiff Lupis was not required to notify GM of the breach or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels, and from other internal sources.

381. As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

382. Plaintiff Lupis and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential

damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT XVI

### Breach of Implied Warranty
### (Mass. G. L. c. 106 § 2-314)

383. Plaintiff Alfred Lupis incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

384. Plaintiff Lupis brings this cause of action against Defendant on behalf of himself and the Class.

385. Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

386. Defendant provided Plaintiff Lupis and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable, pass without objection in the trade under the contract description, and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not merchantable, do not pass without objection in the trade under the contract description, and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are do not provide safe and reliable transportation.

387. Defendant impliedly warranted that the Class Vehicles were of merchantable quality, pass without objection in the trade under the contract description, and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

388. Contrary to the applicable implied warranties, the Class Vehicles and their Wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Lupis and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective Wheels.

389. The alleged Rim Defect is inherent and was present in each Class Vehicle at the time of sale.

390. Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Rim Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' Wheels are substantially certain to fail before their expected useful life has run.

391. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Massachusetts Genera Laws Chapter 106, Section 2-314.

**F.    Claims Brought on Behalf of the Michigan Subclass**

<u>**COUNT XVII**</u>

**Violations of the Michigan Consumer Protection Act**
**(Mich. Comp. Laws § 445.903, *et seq.*)**

392. Plaintiffs Eric Czajka and James Kalkstein, individually and on behalf of the Michigan Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

393. Plaintiffs Czajka and Kalkstein bring this Count individually and on behalf of the Michigan Subclass.

394. Plaintiffs Czajka and Kalkstein and the Michigan Subclass members are "person[s]" within the meaning of the Mich. Comp. Laws. § 445.902(1)(d).

395. At all relevant times, Defendant was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

396. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce ...." Mich. Comp. Laws § 445.903(1).

397. Defendant engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that

goods or services have ... characteristics ... that they do not have ....;" "(e) Representing that goods or services are of a particular standard ... if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

398. In the course of its business, Defendant concealed and suppressed material facts concerning the Corvette's wheels. Defendant failed to disclose the existence of the Wheel Defect. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of Class Vehicles.

399. Defendant knew the Class Vehicles and their wheels were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

400. Defendant owed Plaintiff and the Michigan Subclass a duty to disclose the Wheel Defect because Defendant: (a) possessed superior and exclusive knowledge about the defect; (b) intentionally concealed the foregoing from Plaintiff and the Michigan Subclass; and (c) made incomplete representations about the Corvette while intentionally withholding material facts from Plaintiff and the Michigan Subclass that contradicted these representations.

401. Defendant's omissions were material because they were likely to deceive reasonable consumers.

402. Defendant acted intentionally, knowingly, and maliciously to violate Michigan's CPA, and recklessly disregard Plaintiff's and the Michigan Subclass members' rights. Defendant's knowledge of the Wheel Defect put it on notice that the Corvette was not as advertised. Defendant's violations present a continuing risk to Plaintiff, the Michigan Subclass members, as well as the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

403. As a direct and proximate result of Defendant's violations of the Michigan CPA, Plaintiff and the Michigan Subclass members have suffered injury-in-fact and/or actual damage.

404. Plaintiffs Czajka and Kalkstein and the Michigan Subclass members seek injunctive relief to enjoin Defendant from continuing its unfair and deceptive

acts; monetary damages against Defendant measures as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Subclass member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

405. Plaintiffs Czajka and Kalkstein and the Michigan Subclass members also seek punitive damages against Defendant because Defendant's conduct evidences an extreme deviation from reasonable standards. Defendant flagrantly, maliciously, and fraudulently misrepresented the reliability of the Class Vehicles, deceived Michigan Subclass members, and concealed material facts that only it knew. Defendant's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT XVIII

### Breach of Express Warranty
### (Mich. Comp. Laws §§ 440.2313, 440.2860)

406. Plaintiffs Eric Czajka and James Kalkstein, individually and on behalf of the Michigan Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

407. Plaintiffs Czajka and Kalkstein bring this Count individually and on behalf of the Michigan Subclass.

408. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and a "seller" of motor

vehicles under § 440.2103(1)(c).

409. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws. S 440.2803(1)(p).

410. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

411. The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

412. In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

413. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

414. Defendant's NVLW and warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiffs and the Michigan Subclass members purchased or leased the Class Vehicles with defective wheels.

415. Plaintiffs Czajka and Kalkstein and the Michigan Subclass members

experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiff and the Michigan Subclass members that the Class Vehicles were equipped with defective wheels.

416. Defendant breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

417. Plaintiffs Czajka and Kalkstein reported their wheel failures to Defendant. In addition, Defendant was provided with notice of these issues by numerous NHTSA and consumer complaints filed against it, including the instant Complaint and similar legal proceedings, and has actual knowledge of the defect.

418. As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs Czajka and Kalkstein and the Michigan Subclass members have been damaged in an amount to be determined at trial.

## <u>COUNT XIX</u>

### Breach of Implied Warranty of Merchantability
### (Mich. Comp. Laws §§ 440.2314 and 440.2860)

419. Plaintiff Eric Czajka and James Kalkstein, individually and on behalf of the Michigan Subclass, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

420. Plaintiffs Czajka and Kalkstein bring this Count individually and on

behalf of the Michigan Subclass.

421. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

422. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws. S 440.2803(1)(p).

423. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

424. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

425. Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

426. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included,

among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

427. Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective wheels.

428. The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

429. Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

430. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the Michigan Subclass members have been damaged in an amount to be determined at trial.

### G. Claims Brought on Behalf of the New Hampshire Subclass

## COUNT XX

### Violations Of New Hampshire Consumer Protection Act
### (N.H. Rev. Stat. § 358-A:1, *et seq.*)

431. Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

432. Plaintiffs David Goldberg and Robert and Carole Smith bring this Count individually and on behalf of the New Hampshire Subclass.

433. Plaintiffs, the New Hampshire class members, and Defendant are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire PA").

434. N.H. Rev. Stat. § 358-A:1. Defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

435. The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but ... not limited to, the following: ... (V) Representing that goods or services have ... characteristics, ... uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, ...

if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

436. In the course of its business, Defendant concealed and suppressed material facts concerning the Corvette. Defendant failed to disclose the Wheel Defect. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of Corvette vehicles.

437. Defendant owed Plaintiffs and the New Hampshire Subclass a duty to disclose the true nature of the Corvettes because Defendant: (a) possessed exclusive knowledge about the defect; (b) intentionally concealed the foregoing from Plaintiffs and the New Hampshire Subclass; and (c) made incomplete representations about the Corvette, while purposefully withholding material facts from Plaintiffs and the New Hampshire Subclass that contradicted these representations.

438. Defendant knew about the Wheel Defect at time of sale and lease. Defendant acquired additional information concerning the Wheel Defect after the Corvettes were sold and leased but continued to conceal information.

439. Defendant thus violated the New Hampshire CPA by, at a minimum, employing deception, deceptive acts or practices, fraud, concealment, suppression, or omission of any material fact with the intent that others rely upon such

concealment, suppression, or omission, in connection with the sale and lease of the Class Vehicles.

440. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent mislead Plaintiffs and the New Hampshire Subclass members.

441. Defendant knew or should have known that its conduct violated the New Hampshire CPA.

442. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

443. Plaintiffs and the New Hampshire Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New Hampshire Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them or would have paid significantly less for them if the Wheel Defect had been disclosed.

444. Defendant had an ongoing duty to Plaintiffs and the New Hampshire Subclass to refrain from unfair and deceptive practices under the New Hampshire CPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

445. Defendant's violations present a continuing risk to Plaintiffs, the New Hampshire Subclass, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

446. As a direct and proximate result of Defendant's violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Subclass have suffered injury-in-fact and/or actual damage.

447. Because Defendant's willful conduct caused injury to Plaintiffs and the New Hampshire Subclass members' property through violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Subclass seek recovery of actual damages or $1,000 each, whichever is greater, treble damages, costs, and reasonable attorneys' fees, an order enjoining Defendant's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## COUNT XXI

### Breach of Express Warranty
### (N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210, *et seq.*)

448. Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

449. Plaintiffs David Goldberg and Robert and Carole Smith bring this Count individually and on behalf of the New Hampshire Subclass.

450. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and a "seller" of motor vehicles under § 382-A:2-103(1)(d).

451. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

452. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

453. The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

454. In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

455. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

456. Defendant's NVLW and warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiffs and the New Hampshire

Subclass members purchased or leased the Class Vehicles with defective wheels.

457. Plaintiffs and the New Hampshire Subclass members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiffs and the New Hampshire Subclass members that the Class Vehicles were equipped with defective wheels.

458. Defendant breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

459. Plaintiffs reported their wheel issue to Defendant. In addition, Defendant was provided with notice of these issues by numerous NHTSA and consumer complaints filed against it, including the instant Complaint and similar legal proceedings, and has actual knowledge of the defect.

460. As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the New Hampshire Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXII

### Breach of Implied Warranty of Merchantability
### (N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212, *et seq.*)

461. Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Subclass, incorporate by reference all of the

allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

462. Plaintiffs David Goldberg and Robert and Carole Smith bring this Count individually and on behalf of the New Hampshire Subclass.

463. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and a "seller" of motor vehicles under § 382-A:2-103(1)(d).

464. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

465. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

466. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

467. Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their

particular purpose of providing safe and reliable transportation.

468. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

469. Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective wheels.

470. The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

471. Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

472. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the New Hampshire Subclass members have been damaged in an amount to be determined at trial.

### H.    Claims Brought on Behalf of the New Jersey Subclass

### COUNT XXIII

### Violations of The New Jersey Consumer Fraud Act
### (N.J. STAT. ANN. §§ 56:8-1, *et seq.*)

473. Plaintiff Chookazian incorporates by reference all preceding allegations as though fully set forth herein.

474. Plaintiff Chookazian brings this Count individually and on behalf of the New Jersey Subclass.

475. GM, Plaintiff Chookazian, and the New Jersey Subclass Members are "person[s]" under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

476. GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat § 56:8-1(c), (e). GM's actions as set forth herein occurred in the conduct of trade or commerce.

477. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, et seq. ("New Jersey CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The conduct GM as set forth herein constitutes unfair or deceptive acts or practices.

478. GM participated in misleading, false, or deceptive practices that violated

the New Jersey CFA.

479. In the course of its business, GM willfully failed to disclose and/or actively concealed the fact that the Class Vehicles have defective wheels discussed herein and the fact that GM would not cover repair or replacement of the defective wheels under its warranty, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

480. GM was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.

481. By failing to disclose that the Class Vehicles have defective wheels and were not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its warranty and vehicles after they were sold, GM engaged in deceptive business practices in violation of the New Jersey CFA.

482. GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiff Chookazian and the other Class members, about the true performance of the Class Vehicles, the quality of the GM brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

483. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff Chookazian and the New Jersey Subclass.

484. GM knew or should have known that its conduct violated the New Jersey CFA.

485. GM owed Plaintiff Chookazian a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because GM had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective wheels and its warranty coverage.

486. The existence of the Defect, the defective wheels, and the true performance of the Class Vehicles were material facts to Plaintiff Chookazian and the New Jersey Subclass.

487. GM's violations present a continuing risk to Plaintiff Chookazian and the New Jersey Subclass members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

488. GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the New Jersey CFA. All owners of the Class Vehicles suffered ascertainable loss from not obtaining the benefit of their bargains.

489. As a direct and proximate result of GM's violations of the New Jersey CFA, Plaintiff Chookazian and the New Jersey Subclass have suffered injury-in-fact and/or actual damage in paying to replace and/or repair defective wheels and in paying more to purchase or lease the Class Vehicles than they would have had they known of the Wheel Defect. Class members who purchased or leased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them but for GM's violations of the New Jersey CFA.

490. As a result of the foregoing wrongful conduct of GM, Plaintiffs and the New Jersey Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to, actual and statutory damages, treble damages, and order enjoining GM's deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## COUNT XXIV

### Breach of Express Warranty
### (N.J. STAT. ANN. § 12A:2-313 AND 12A:2A-210)

491. Plaintiff Chookazian incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

121

492. Plaintiff Chookazian brings this Count individually and on behalf of the New Jersey Subclass.

493. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104 and a "seller" of motor vehicles under § 12A:2-313.

494. With respect to leases, GM is and was at all relevant times a "lessor" with respect to motor vehicles under NJ. Stat. Ann. § 12A:2A-103(1)(p), and § 12A:2A-210.

495. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-104(1) and § 12A:2A-103(1)(h).

496. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

497. As a manufacturer of motor vehicles, GM was required to provide these warranties to purchasers of the Class Vehicles.

498. GM's warranties formed the basis of the bargain that was reached when Plaintiff Chookazian and other Class members purchased or leased their Class Vehicles equipped with the defective wheels.

499. Plaintiff Chookazian and the Class members experienced defects within

the warranty period.

500. GM breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by GM. GM has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

501. Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

502. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Chookazian and Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

503. Accordingly, recovery by Plaintiff Chookazian and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff Chookazian, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

504. Also, as alleged in more detail herein, at the time GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to GM's warranties and were inherently defective, and GM wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff Chookazian and the

other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

505. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein. Due to GM's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff Chookazian's and the other Class members' remedies would be insufficient to make Plaintiff Chookazian and the other Class members whole.

506. Finally, due to GM's breach of warranty as set forth herein, Plaintiff Chookazian and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for the return to Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

507. GM was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

508. As a direct and proximate result of GM's breach of express warranties, Plaintiff Chookazian and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XXV

### Breach of Implied Warranty Of Merchantability
### (N.J. STAT. ANN. § 12-A:2-314)

509. Plaintiff Chookazian incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

510. Plaintiff Chookazian brings this Count individually and on behalf of the New Jersey Subclass.

511. GM is and was at all relevant times a merchant with respect to motor vehicles.

512. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the defective wheels are not safe, merchantable or suitable for high performance sports cars.

513. GM was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

514. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff Chookazian and the other Class members have been

125

damaged in an amount to be proven at trial.

## I.   Claims Brought on Behalf of the New York Subclass

### COUNT XXVI

### Violations Of New York General Business Law § 349
### (N.Y. GEN. BUS. LAW § 349)

515. Plaintiff Williams incorporates by reference all preceding allegations as though fully set forth herein.

516. Plaintiff Williams brings this Count individually and on behalf of the New York Subclass.

517. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

518. In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk of the Wheel Defect in Class Vehicles as described above. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

519. GM's actions as set forth above occurred in the conduct of trade or commerce.

520. Because GM's deception takes place in the context of automobile safety, its deception affects the public interest. Further, GM's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a

broad impact on consumers at large.

521. GM's conduct proximately caused injuries to Plaintiff Williams and the other Class members.

522. Plaintiff Williams and the other Class members were injured as a result of GM's conduct in that Plaintiff Williams and the New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

## COUNT XXVII

### Violations of New York General Business Law § 350
### (N.Y. GEN. BUS. LAW § 350)

523. Plaintiff Williams incorporates by reference all preceding allegations as though fully set forth herein.

524. Plaintiff Williams brings this Count individually and on behalf of the New York Subclass.

525. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

526. GM caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiff Williams and the other Class members.

527. GM has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the defective wheels in Class Vehicles as described above, and the fact that GM would not cover repair or replacement of the wheels under its warranty, were material and likely to deceive a reasonable consumer.

528. Plaintiff Williams and the other Class members have suffered injury, including the loss of money or property, as a result of GM's false advertising. In purchasing or leasing their Class Vehicles, Plaintiff Williams and the other Class members relied on the representations and/or omissions of GM with respect to the safety, quality, functionality, and reliability of the Class Vehicles and the coverage of GM's "Bumper-to-Bumper" warranty.

529. Accordingly, Plaintiff Williams and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles.

530. Plaintiff Williams, individually and on behalf of the other New York Subclass members, requests that this Court enter such orders or judgments as may

be necessary to enjoin GM from continuing its unfair, unlawful and/or deceptive practices. Plaintiff Williams and the other Class members are also entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully or knowingly, Plaintiff Williams and the other Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT XXVIII

### Breach of Express Warranty
### (N.Y. U.C.C. § 2-313)

531. Plaintiff Williams incorporates by reference all preceding allegations as though fully set forth herein.

532. Plaintiff Williams brings this Count on behalf of the New York Subclass.

533. GM is and was at all relevant times a merchant with respect to motor vehicles.

534. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

535. GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff Williams and the other Class members purchased or leased their Class Vehicles equipped with defective wheels from GM.

536. GM breached the express warranty to repair or replace defects in

materials and workmanship of any part of the Class Vehicles.

537. Furthermore, the limited warranty of repair and/or replacement fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Williams and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

538. Accordingly, recovery by Plaintiff Williams and the New York Subclass members is not limited to the limited warranty of repair or replacement to parts defective in materials or workmanship, and Plaintiff Williams, individually and on behalf of the other Class members, seek all remedies as allowed by law.

539. Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to GM's Limited Warranty and were inherently defective, and GM wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff Williams and the New York Subclass members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

540. Due to GM's breach of warranty as set forth herein, Plaintiff Williams and the other New York Subclass members assert as an additional and/or alternative remedy, as set forth in N.Y. U.C.C. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff Williams and to the other New York Subclass members of the purchase price of all Class Vehicles currently owned for such other

incidental and consequential damages as allowed under N.Y. U.C.C. §§ 2-711 and 2-608.

541. GM was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint.

542. As a direct and proximate result of GM's breach of express warranty, Plaintiff Williams and the other Subclass members have been damaged in an amount to be determined at trial.

**J.      Claims Brought on Behalf of the Pennsylvania Subclass**

<u>**COUNT XXIX**</u>

**Violation of the Pennsylvania Unfair Trade Practices and
Consumer Protection Law
(73 P.S. § 201-1, *et seq.*)**

543. Plaintiffs Joseph Bossart and Michael Roth, individually and on behalf of the Pennsylvania Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

544. Plaintiffs Bossart and Roth bring this Count individually and on behalf of the Pennsylvania Subclass.

545. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members purchased or leased their Class Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

546. All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

547. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

548. Defendant engaged in unlawful trade practices, including engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding; specifically, failing to disclose and actively concealing the material fact of the Wheel Defect and the true nature of its wheels.

549. In the course of its business, Defendant concealed the Wheel Defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

550. Defendant has known of the Wheel Defect and the true nature of the defective wheels when it sold the Class Vehicles but concealed all of that information.

551. By failing to disclose and by actively concealing the Wheel Defect and the true nature of the defective wheels, Defendant engaged in unfair and deceptive business practices in violation of the UTPCPL.

552. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Bossart and Roth and the Pennsylvania Subclass members, about the true performance and characteristics of the Class Vehicles.

553. Defendant intentionally and knowingly omitted material facts regarding the Class Vehicles with intent to mislead Plaintiffs Bossart and Roth and the Pennsylvania Subclass members.

554. Defendant knew or should have known that its conduct violated the UTPCPL.

555. Because Defendant fraudulently concealed the Wheel Defect, the value of the Class Vehicles has greatly diminished.

556. Defendant's concealment of the true characteristics of the subject Wheels was material to Plaintiffs Bossart and Roth and the Pennsylvania Subclass members. Plaintiffs and the Pennsylvania Subclass members suffered ascertainable loss caused

by Defendant's omissions and its concealment of and failure to disclose material information.

557. Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive acts or practices under the UTPCPL. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles and as a loss of the benefit of the bargain as a result of Defendant's deceptive and unfair acts and practices that occurred in the course of Defendant's business.

558. As a direct and proximate result of Defendant's violations of the UTPCPL, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have suffered injury-in-fact and/or actual damage.

559. Defendant is liable to Plaintiffs Bossart and Roth and the Pennsylvania Subclass members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. See 73 P.S. § 201-9.2(a). Plaintiffs Bossart and Roth and the Pennsylvania Subclass members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XXX

### Breach of Express Warranty
### (13 PA. Cons. Stat. §§ 2313, 2A210)

560. Plaintiffs Joseph Bossart and Michael Roth, individually and on behalf of the Pennsylvania Subclass, incorporate by reference all of the allegations

134

contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

561. Plaintiffs Bossart and Roth bring this Count individually and on behalf of the Pennsylvania Subclass.

562. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

563. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

564. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

565. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

566. GM provided all purchasers and lessees of Class Vehicles with the GM Warranty.

567. In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor,

will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

568. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

569. Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiff's and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

570. GM manufactured and/or installed the Wheels and the Wheels' component parts in the Class Vehicles, and the Wheels and their component parts are covered by the express Warranties.

571. The Wheel Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs Bossart and Roth and the Pennsylvania Subclass members.

572. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

573. Under the express Warranties, GM was obligated to correct the Wheel Defect in the vehicles owned or leased by Plaintiffs Bossart and Roth and the Pennsylvania Subclass members.

574. Although GM was obligated to correct the Wheel Defect, none of the attempted fixes to the Wheels are adequate under the terms of the Warranties, as they did not cure the defect.

575. GM breached the express Warranties by failing to repair or replace the Wheels, or by performing illusory repairs such as replacing the Wheels with equally defective Wheels.

576. GM and its agent dealers have failed and refused to conform the Wheels to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

577. Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

578. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiffs Bossart and Roth and the Pennsylvania Subclass members. Among other things, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members had no meaningful choice in determining

these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Pennsylvania Subclass members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

579. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

580. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Wheel Defect from the complaints and service requests it received from Plaintiffs Bossart and Roth and the Pennsylvania Subclass members, from repairs and/or replacements of the wheels or components thereof, and through other internal and external sources.

581. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Wheel Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Wheel Defect.

582. Because GM has not been able remedy the Wheel Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential

purposes, rendering them null and void.

583. As a direct and proximate cause of GM's breach, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

584. As a direct and proximate result of GM's breach of express warranties, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXXI

### Breach of Implied Warranty of Merchantability
### (13 Pa. Cons. Stat. §§ 2314 and 2A212)

585. Plaintiffs Joseph Bossart and Michael Roth, individually and on behalf of the Pennsylvania Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

586. Plaintiffs Bossart and Roth bring this Count individually and on behalf of the Pennsylvania Subclass.

587. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor

vehicles under § 2103(a).

588. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

589. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

590. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

591. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the Wheels to customers through authorized dealers, like those from whom Plaintiffs Bossart and Roth and the Pennsylvania Subclass members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs Bossart and Roth and the Pennsylvania Subclass members, with no modification to the defective Wheels.

592. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

593. This implied warranty included, among other things: (i) a warranty that

140

the Class Vehicles and their Wheels that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Wheels would be fit for their intended use while the Class Vehicles were being operated.

594. Contrary to the applicable implied warranties, the Class Vehicles and their Wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs Bossart and Roth and the Pennsylvania Subclass members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their Wheels and the existence of the Wheel Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

595. As a result of GM's breach of the applicable implied warranties, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Wheel Defect, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members were harmed and suffered actual damages in that the Class Vehicles' Wheels are substantially certain to fail before their expected useful life has run.

596. GM's actions, as complained of herein, breached the implied warranty

that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212.

597. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

598. Plaintiffs Bossart and Roth and the Pennsylvania Subclass members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Wheel Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Wheels or components thereof, and through other internal sources.

599. As a direct and proximate cause of GM's breach, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

600. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs Bossart and Roth and the Pennsylvania Subclass members have been damaged in an amount to be proven at trial.

**K.     Claims Brought on Behalf of the Ohio Subclass**

<u>COUNT XXXII</u>

**Violations of the Ohio Consumer Sales Practices Act
(Ohio Rev. Code. § 1345.01, *et seq.*)**

601. Plaintiffs Dennis and Marianne Glazer (the "Glazer Plaintiffs"), individually and on behalf of the Ohio Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

602. The Glazer Plaintiffs bring this Count individually and on behalf of the Ohio Subclass.

603. GM is a "supplier," as defined by Ohio Rev. Code § 1345.01.

604. The Glazer Plaintiffs and the Ohio Subclass members are "consumers," as defined by Ohio Rev. Code § 1345.01.

605. As a result of placing a defective product into the stream of commerce, GM has breached its implied warranty in tort, which is an unfair and deceptive act as defined in Ohio Rev. Code § 1345.09(B).

606. GM has committed unfair and deceptive acts, in violation of Ohio's Consumer Sales Practices Act, by knowingly placing into the stream of commerce Class Vehicles equipped with defective wheels that are prone to failure; specifically, bending and cracking.

607. Moreover, GM has committed unfair, deceptive, and unconscionable acts

143

by knowingly concealing the defect in the Class Vehicles, failing to inform the Glazer Plaintiffs and the Ohio Subclass members of this defect, and in the following ways:

a) At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to The Glazer Plaintiffs and the Ohio Subclass members the known defects in the wheels and the known risks associated therewith.

b) Thereafter, Defendant failed to disclose the defects to the Glazer Plaintiffs and the Ohio Subclass members, either through warnings or recall notices, and/or actively concealed from them the fact that the Class Vehicles' wheels were defective, even though GM knew of such defects.

c) Defendant caused the Glazer Plaintiffs and the Ohio Subclass members to expend sums of money at its dealerships and elsewhere to repair and/or replace the defective wheels on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

d) Additionally, Defendant, in administering the Warranty, engaged in materially misleading deceptive acts and practices by refusing to

cover the wheels and/or replacing failing wheels with equally defective wheels and denying the existence of and refusing to repair the widely known problems with the wheels.

e) Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

608. The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the true defective nature of the wheels.

609. By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts in breach of its duty not to do so.

610. The Glazer Plaintiffs, the Ohio Subclass members, and members of the

public were deceived by Defendant's failure to disclose and could not discover the defect themselves before suffering their injuries.

611. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that acts and omissions similar to kinds alleged in this Complaint, including, but not limited to, the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act. These cases include, but are not limited to, the following:

a) *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b) *State ex rel. Betty D. Montgomery v. Ford Motor Co*. (OPIF #10002123);

c) *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc*. (OPIF #10002025);

d) *Bellinger v. HewJayavelu-Packard Co*., No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e) *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f) *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

g) *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc*. (OPIF

#10001586);

h) *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i) *Brinkman v. Mazda Motor of America, Inc.,* (OPIF #10001427);

j) *Khouri v. Don Lewis*, (OPIF #100001995);

k) *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

l) *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and,

m) *Brown v. Spears*, (OPIF #10000403).

n) *Williams v. Am. Suzuki Motor Corp*., 2008 Ohio 3123; 2008 WL 2571584 (June 23, 2008)

612. GM committed these and other unfair and deceptive acts in connection with the marketing and sale of the Class Vehicles.

613. As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices, the Glazer Plaintiffs and the Ohio Subclass members have been damaged because they: purchased Class Vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for wheel diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.

Meanwhile, GM has sold more Class Vehicles than it otherwise could and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

614. The Glazer Plaintiffs and the Ohio Subclass members seek restitution of the substantial sums of money they expended, including to replace their Corvettes' defective wheels, which Defendant knew about prior to the sale of the Class Vehicles.

615. The Glazer Plaintiffs and Ohio Subclass members also seek appropriate equitable relief, including an order requiring GM to adequately disclose and remediate the Wheel Defect and enjoining GM from incorporating the defective wheels into its vehicles in the future.

616. GM is liable to the Glazer Plaintiffs and the Ohio Subclass members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code § 1345.09.

## COUNT XXXIII

### Breach of Express Warranty
### (Under Ohio Law)

617. Plaintiffs Dennis and Marianne Glazer (the "Glazer Plaintiffs"), individually and on behalf of the Ohio Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

618. The Glazer Plaintiffs bring this Count individually and on behalf of the

Ohio Subclass.

619. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

620. The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

621. In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

622. According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

623. Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, when Defendant did agree to pay

a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing the Glazer Plaintiffs' and the Ohio Subclass Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

624. The Glazer Plaintiffs and the Ohio Subclass members were not required to notify GM of the breach or were not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels, and from other internal sources.

625. As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Ohio Subclass Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, the Glazer Plaintiffs and the Ohio Subclass members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

626. The Glazer Plaintiffs and the Ohio Subclass members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT XXXIV

### Breach of the Implied Warranty of Merchantability
### (Under Ohio Law)

627. Plaintiffs Dennis and Marianne Glazer (the "Glazer Plaintiffs"), individually and on behalf of the Ohio Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

628. The Glazer Plaintiffs bring this Count individually and on behalf of the Ohio Subclass.

629. Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

630. Defendant provided the Glazer Plaintiffs and the Ohio Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

631. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included,

among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

632. Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing the Glazer Plaintiffs and the Ohio Subclass members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective wheels.

633. The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

634. Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, the Glazer Plaintiffs and the Ohio Subclass members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

635. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

### L.    Claims Brought on Behalf of the South Carolina Subclass

### COUNT XXXV

**Violations of the Unfair Trade Practices Act**
**(S.C. Code § 39-5-10, *et seq*.)**

636. Plaintiff Turner incorporates by reference all preceding allegations as though fully set forth herein.

637. Plaintiff Turner brings this Count individually and on behalf of the South Carolina Subclass.

638. GM, Plaintiff Turner, and the South Carolina Subclass members are "person[s]" under the South Carolina Unfair Trade Practices Act ("SCUTPA")

639. GM engaged in "sales" of "merchandise" within the meaning of SCUTPA. GM's actions as set forth herein occurred in the conduct of trade or commerce.

640. SCUTPA prohibits unconscionable, unfair or deceptive acts or practices in the conduct of any trade or commerce. The conduct GM as set forth herein constitutes unconscionable, unfair or deceptive acts or practices.

641. GM participated in misleading, false, or deceptive practices that violated the SCUTPA.

642. In the course of its business, GM willfully failed to disclose and/or actively concealed the fact that the Class Vehicles have defective wheels discussed herein and the fact that GM would not cover repair or replacement of the defective

wheels under its warranty, and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

643. GM was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants and the public.

644. By failing to disclose that the Class Vehicles have defective wheels and were not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its warranty and vehicles after they were sold, GM engaged in deceptive business practices in violation of the New Jersey CFA.

645. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Turner and the South Carolina Subclass members, about the true performance of the Class Vehicles, the quality of the GM brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

646. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff Turner and the South Carolina Subclass.

647. GM knew or should have known that its conduct violated the SCUTPA.

648. GM owed Plaintiff Turner and the South Carolina Subclass members a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because GM had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective wheels and its warranty coverage.

649. The existence of the Defect, the defective wheels, and the true performance of the Class Vehicles were material facts to Plaintiff Turner and the South Carolina Subclass.

650. GM's violations present a continuing risk to Plaintiff Turner and the South Carolina Subclass members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

651. GM had an ongoing duty to all GM customers to refrain from unconscionable, unfair and deceptive practices under the SCUTPA. All owners of the Class Vehicles suffered ascertainable loss from not obtaining the benefit of their bargains.

652. As a direct and proximate result of GM's violations of the SCUTPA,

Plaintiff Turner and the South Carolina Subclass have suffered injury-in-fact and/or actual damage in paying to replace and/or repair defective wheels and in paying more to purchase or lease the Class Vehicles than they would have had they known of the defective wheels. Subclass members who purchased or leased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them but for GM's violations of the SCUTPA.

653. As a result of the foregoing wrongful conduct of GM, Plaintiff Turner and the South Carolina Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to, actual and statutory damages, treble damages, and order enjoining GM's deceptive and unfair conduct, costs and reasonable attorneys' fees, and all other just and appropriate relief.

## COUNT XXXVI

### Breach of Express Warranty
### (S.C. CODE § 36-2-313)

654. Plaintiff Turner incorporates by reference all preceding allegations as though fully set forth herein.

655. Plaintiff Turner brings this Count individually and on behalf of the South Carolina Subclass.

656. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

657. As a manufacturer of motor vehicles, GM was required to provide these warranties to purchasers of the Class Vehicles.

658. GM's warranties formed the basis of the bargain that was reached when Plaintiff Turner and South Carolina Subclass members purchased or leased their Class Vehicles equipped with the defective wheels.

659. Plaintiff Turner and the South Carolina Subclass members experienced defects within the warranty period.

660. GM breached the express warranty promising to repair or replace a manufacturing defect or materials or workmanship of any part of the Class Vehicles.

661. Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

662. Furthermore, the limited warranty promising to repair or replace a defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Turner and South Carolina Subclass members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

663. Accordingly, recovery by Plaintiff Turner and the other South Carolina Subclass members is not limited to the limited warranty promising to repair or

replace a defect, and Plaintiff Turner, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

664. Also, as alleged in more detail herein, at the time GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to GM's warranties and were inherently defective, and GM wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff Turner and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

665. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein. Due to GM's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff Turner's and the other South Carolina Subclass members' remedies would be insufficient to make Plaintiff Turner and the South Carolina Subclass members whole.

666. Finally, due to GM's breach of warranty as set forth herein, Plaintiff Turner and the South Carolina Subclass members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for the return to Plaintiff Turner and the other Subclass members of the purchase price of all Class

Vehicles currently owned, and for such other incidental and consequential damages as allowed.

667. GM was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

668. As a direct and proximate result of GM's breach of express warranties, Plaintiff Turner and the South Carolina Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXXVII

### Breach of Implied Warranty
### (S.C. CODE § 36-2-314)

669. Plaintiff Turner incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

670. Plaintiff Turner brings this Count individually and on behalf of the South Carolina Subclass.

671. GM is and was at all relevant times a merchant with respect to motor vehicles.

672. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently

defective in that the defective wheels are not safe, merchantable or suitable for high performance sports cars.

673. GM was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

674. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff Turner and the other South Carolina Class members have been damaged in an amount to be proven at trial.

### M.   Claims Brought on Behalf of the Texas Subclass

### <u>COUNT XXXVIII</u>

### Violations of the Deceptive Trade Practices Act
### (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

675. Plaintiff Barker incorporates by reference all preceding allegations as though fully set forth herein.

676. Plaintiff Barker brings this Count individually and on behalf of the Texas Subclass.

677. Plaintiff Barker and the Texas Subclass members are individuals, partnerships or corporations with assets of less than $25 million (or are controller by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code §

17.45(4).

678. GM is a "person" within the meaning of TEX. BUS. & COM. CODE § 17.45(3).

679. GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TEX. BUS. & COM. CODE § 17.46(A).

680. The Texas Deceptive Trade Practices Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE §§ 17.45(5) and 17.50(a)(3).

681. In the course of its business, GM willfully failed to disclose and actively concealed the Wheel Defect discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

682. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Barker and the Texas Subclass members, about the true performance of the Class Vehicles, the quality of the GM brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

683. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff Barker and the Texas Subclass.

684. GM knew or should have known that its conduct violated the Texas DTPA.

685. As alleged above, GM made material statements about the safety and utility of the Class Vehicles and the GM brand that were either false or misleading.

686. GM owed Plaintiff Barker and the Texas Subclass a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because GM had exclusive or superior knowledge and concealed material facts and/or omitted material facts regarding the defective wheels and its warranty coverage.

687. GM's deception and fraud regarding the defective wheels and the true performance of the Class Vehicles were material to Plaintiff Barker and the Texas Subclass.

688. Plaintiff Barker and the Texas Subclass suffered ascertainable loss

caused by GM's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for GM's violations of the Texas DTPA.

689. GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

690. GM's violations present a continuing risk to Plaintiff Barker and the Texas Subclass members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

691. As a direct and proximate result of GM's violations of the Texas DTPA, Plaintiff Barker and the Texas Subclass have suffered injury-in-fact and/or actual damage.

692. Pursuant to TEX. BUS. & COM. CODE § 17.50, Plaintiff Barker and the Texas Subclass seek monetary relief against GM measured as actual damages in an amount to be determined at trial, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

693. Plaintiff Barker has sent a letter in accordance with TEX. BUS. & COM.

CODE § 17.505(a). Unless GM has remedied its unlawful conduct within the requisite time period, Plaintiff Barker seeks all damages and relief to which Plaintiff Barker and the Texas Subclass are entitled.

## COUNT XXXIX

### Breach of Express Warranty
### (TEX. BUS. & COM. CODE § 2.313)

694. Plaintiff Barker incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

695. Plaintiff Barker brings this Count individually and on behalf of the Texas Subclass.

696. GM is and was at all relevant times a "merchant" with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104(a) and a "seller" of motor vehicles under § 2.313(a).

697. The Class Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 2.105(a) and § 2.313.

698. In connection with the purchase or lease of each one of its new vehicles, GM provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover the entire vehicle for any "defect in materials or workmanship."

699. As a manufacturer of motor vehicles, GM was required to provide these warranties to purchasers of its Class Vehicles.

700. GM's warranties formed the basis of the bargain that was reached when Plaintiff Barker and other Texas Subclass members purchased or leased their Class Vehicles equipped with the defective wheels.

701. Plaintiff Barker and the Texas Subclass members experienced defects within the warranty period.

702. GM breached the express warranty promising to repair or replace a defect in materials or workmanship of any part supplied by GM.

703. Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

704. Furthermore, the limited warranty promising to repair and/or replace a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Barker and the Texas Subclass members whole, and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

705. Accordingly, recovery by Plaintiff Barker and the Texas Subclass members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff Barker, individually and on behalf of the other Subclass members, seeks all remedies as allowed by law.

706. Also, as alleged in more detail herein, at the time GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to GM's

warranties and were inherently defective, and GM wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff Barker and the other Subclass members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

707. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments as many incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein. Due to GM's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff Barker's and the other Subclass members' remedies would be insufficient to make Plaintiff Barker and the Texas Subclass members whole.

708. GM was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

709. As a direct and proximate result of GM's breach of express warranties, Plaintiff Barker and the Texas Subclass members have been damaged in an amount to be determined at trial.

## COUNT XL

### Breach of Implied Warranty Of Merchantability
### (Tex. Bus. & Com. Code § 2.314)

710. Plaintiff Barker incorporates by reference all allegations of the preceding

paragraphs as though fully set forth herein.

711. Plaintiff Barker brings this Count individually and on behalf of the Texas Subclass.

712. GM is and was at all relevant times a merchant with respect to motor vehicles.

713. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the defective wheels are not safe, merchantable or suitable for high performance sports cars.

714. GM was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

715. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff Barker and the Texas Subclass members have been damaged in an amount to be proven at trial.

## VIII. PRAYER FOR RELIEF

716. Plaintiffs, on behalf of themselves and all others similarly situated,

request the Court to enter judgment against Defendant, as follows:

a) An order certifying the proposed Class, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

b) A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the wheels, including the need for periodic maintenance;

c) An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to. 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective wheels with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

d) An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven

at trial;

e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

f) Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

g) A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

h) An award of attorneys' fees and costs, as allowed by law;

i) An award of pre-judgment and post-judgment interest, as provided by law;

j) Leave to amend the Complaint to conform to the evidence produced at trial; and

k) Such other relief as may be appropriate under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

717. Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated: September 9, 2020       Respectfully submitted,

By:*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

Russell D. Paul
Abigail Gertner
Amey J. Park
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
agertner@bm.net
apark@bm.net

Steven R. Weinmann
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.: (310) 556-4811
Fax: (310) 943-0396
Steven.Weinmann@capstonelawyers.com
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Trisha.Monesi@capstonelawyers.com

Peter A. Muhic
LeVAN MUHIC STAPLETON LLC
One Liberty Place
1650 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (215) 561-1500
pmuhic@levanmuhic.com

Edwin J. Kilpela, Jr
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
ekilpela@carlsonlynch.com

Jonathan M. Jagher
Kimberly A. Justice
FREED KANNER LONDON & MILLEN
LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
Fax: (224) 632-4521
jjagher@fklmlaw.com
kjustice@fklmlaw.com

Michael K. Yarnoff
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza, Suite 1020 1500
JFK Boulevard
Philadelphia, Pennsylvania 19102
Tel: (215) 792-6676
Fax: (215) 792-6676
myarnoff@kehoelawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2020 I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com